Sharon **SUZUKI**, on behalf of herself and all other persons similarly situated, Plaintiffs-Appellees,

and

Rosita T. **Alba** and Jane **Doe,** Intervenors-Appellees,

v.

George **YUEN**, in his capacity as Director of Health, State of Hawaii, Defendant-Appellant.

Nos. 78–1830, 78–3190.

United States Court of Appeals, Ninth Circuit.

April 16, 1980.

---

Leo B. Young, Deputy Atty. Gen., Honolulu, Hawaii, argued for defendant-appellant; Ronald Y. Amemiya, Atty. Gen., Honolulu, Hawaii, on the brief.

Paul Alston, Honolulu, Hawaii, Robert Plotkin, Washington, D. C., for plaintiffs-appellees.

Before WRIGHT, GOODWIN and SCHROEDER, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

We here review in No. 78–1830 the constitutionality of Hawaii's statutory procedures for the involuntary commitment of mental patients. The district court in a four part opinion held four provisions of the statute unconstitutional. It ruled correctly that the present statute unconstitutionally permits commitment of a person dangerous to any property, and that the statute unconstitutionally fails to require a showing of imminent danger before commitment.

Contrary to the district court's ruling, however we hold that (1) the present statute does not unconstitutionally deprive persons of their privilege against self-incrimination; and (2) the state need not establish the elements of commitment by proof beyond a reasonable doubt.

We also review the court's decision in No. 78–3190 which denied a stay of execution on the award of attorneys fees. The court

awarded plaintiffs' attorneys, Legal Aid Society of Hawaii and Paul Alston, substantial fees for their services. Because the state did not appeal the award, we do not review it.

The state did, however, move to stay the award pending appeal. The court denied the motion and issued a garnishment order. Defendants appealed. Plaintiffs' attorney garnished state funds on deposit in a bank, and have been paid the amount allowed. Because the fees have been paid, and because we affirm in part the plaintiff's judgment in No. 78–1830, the appeal from the order denying a stay is moot, and the appeal in 78–3190 is dismissed.

## FACTS

In June 1973 plaintiff Suzuki sought a writ of habeas corpus and release from her involuntary commitment to Queen's Medical Center Psychiatric Facility in Honolulu.[1] She also sought a declaratory judgment that portions of Hawaii's mental health laws are unconstitutional, and an injunction against the involuntary commitment of persons under those statutes. The court certified a class action in July, 1975, the class to consist of:

> All persons who are now or who may be in the future admitted [to] and detained at a psychiatric facility

pursuant to the statutes in question. *Suzuki v. Quisenberry*, 411 F.Supp. 1113, 1118 (D.Haw.1976) (Suzuki I.) In a compre-

hensive opinion, the district judge declared Hawaii's procedures for involuntary civil commitment unconstitutional. He retained jurisdiction to rule on the constitutionality of any curative legislation. Judgment was entered in March, 1976.

In April the Hawaii legislature responded, enacting the statutes now before us. The present action was filed in September, 1976. Plaintiff Suzuki, on behalf of herself and the class certified in *Suzuki I*, sought a declaration that specified portions of the 1976 law are unconstitutional. There being no disputed factual issues, both parties moved for summary judgment. The district court granted plaintiffs' motion. *Suzuki v. Yuen*, 438 F.Supp. 1106 (D.Haw. 1977).

The challenged statutes are set forth in the margin.[2] The trial judge's decision is in four parts, each of which we review separately.

(1) He ruled that the state may not involuntarily commit one who is dangerous to property.

(2) He ruled that the state cannot commit one involuntarily for up to five days in order to evaluate him when he refuses examination. That procedure, the court held, violates the Fifth Amendment's privilege against self-incrimination.

(3) The court held the statute unconstitutionally fails to specify that only "im-

---

1. The habeas corpus issue became moot when Ms. Suzuki was released from the hospital.

2. H.R.S. § 334–60(b)(1) sets forth circumstances under which a person may be committed to a psychiatric facility for hospitalization in a nonconsensual nonemergency situation:

   A person may be committed to a psychiatric facility for involuntary hospitalization if the court finds:

   (A) That the person is mentally ill or suffering from substance abuse, and

   (B) That he is dangerous to himself or others or to property, and

   (C) That he is in need of care and/or treatment, and there is no suitable alternative available through existing facilities and programs which would be less restrictive than hospitalization.

   § 334–60(b)(4)(G) provides:

   No individual may be found to require medical treatment unless at least one physician who has personally examined him testifies in person at the hearing. This testimony may be waived by the subject of the petition. If the subject of the petition has refused to be examined by a licensed physician, he may be examined by a court-appointed licensed physician. If he refuses and there is sufficient evidence to believe that the allegations of the petition are true, the court may make a temporary order committing him to a psychiatric facility for a period of not more than five days for the purpose of a diagnostic examination and evaluation. The subject's refusal shall be treated as a denial that he is mentally ill or suffering from substance abuse. Nothing herein, however, shall limit the individual's privilege against self-incrimination.

minently dangerous" persons may be committed.

(4) Finally, the court struck down that portion of the statute which allows for a five-day diagnostic commitment because, under the statute, the state need not prove beyond a reasonable doubt that the person needs commitment.

## I. Danger to Property

■ The district court held unconstitutional that part of the statute [3] which allows the state to commit a mentally ill person who is dangerous only to property, but not to himself or others. The court reasoned that the state's interest in protecting property is not sufficiently compelling to warrant the curtailment of liberty brought about by involuntary civil commitment.

The statute allows the state to commit a mentally ill person who is "dangerous to property." The term "dangerous to property" is defined as

inflicting, attempting or threatening imminently to inflict damage to *any property* in a manner which constitutes a crime, as evidenced by a recent act, attempt or threat.

H.R.S. § 334–1. (Emphasis supplied)

We need not decide whether a state may ever commit one who is dangerous to property. This statute would allow commitment for danger to any property regardless of value or significance. Because it would permit the state to deprive one of his liberty when he threatens harm to *any* property, it is too broad and is unconstitutional.

■ It is settled that a state may not commit one to a mental hospital unless:

his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty.

*Humphrey v. Cady*, 405 U.S. 504, 509, 92 S.Ct. 1048, 1052, 31 L.Ed.2d 394 (1972).

More recently, the Court has stated that:

The individual should not be asked to share equally with society the risk of error when the possible injury to the individual [from commitment] is significantly greater than any possible harm to the state.

*Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979).

Under the current Hawaii definition of "danger to property," a person could be committed if he threatened to shoot a trespassing dog. The state's interest in protecting animals must be outweighed by the individual's interest in personal liberty.

■ In drafting involuntary commitment statutes, states should be cognizant of the "significant deprivation of liberty," *Addington, supra*, 441 U.S. at p. 424, 99 S.Ct. at p. 1809, and of the requirement that the countervailing state interest be equally significant.[4] We express no opinion as to whether protecting property might ever be significant enough to permit involuntary commitment. The protection of just any property is not. This portion of the decision below is affirmed.

## II. Privilege Against Self-Incrimination

■ H.R.S. § 334–60(b)(4)(G) permits the court to order commitment up to five days "for the purpose of a diagnostic examination and evaluation" if a person refuses to be examined by a physician, and "there is

---

**3.** § 334–60(b)(1)(B), reproduced in footnote 2, provides that a person "may be committed . . if the court finds . . . that the person is mentally ill . . . and is dangerous to . . property."

**4.** We are persuaded, too, by the following passage, written by a professor of law and psychiatry;

Even if one accepts a simplistic concept of dangerousness, such as a propensity to commit criminal acts, should one regard danger-

ousness to property as being of the same social significance as violence to the person of others? . . . Clearly, it makes a difference to society if an offender is dangerous to property because of his need to write graffiti on subway walls or if he is dangerous because he molests little children or has an uncontrollable impulse to murder.

Diamond, "The Psychiatric Prediction of Dangerousness," 123 U.Pa.L.Rev. 439, 449–450 (1974).

sufficient evidence to believe that the allegations of the petition are true."

The district court held this provision unconstitutional because it denies the patient the right to remain silent guaranteed by the Fifth Amendment. The court reasoned:

> Under § 334–(b)(4)(G), we have the situation where an individual may be committed, not because of statements he makes, but because of his refusal to participate in an examination even though he states that he understands the purpose of it.

438 F.Supp. at p. 1112.

Contrary to the district court's conclusion, we find that the patient is not to be confined for a refusal to talk but because he is dangerous. The statute must be read in its entirety. Refusal to speak does not by itself bring about confinement for there must be a showing of "sufficient evidence to believe that the allegations of the petition are true." [5]

It is inaccurate, then, to conclude that the statute penalizes one who exercises his right to remain silent. It gives the silent person the benefit of the doubt, construing his silence as a denial that he needs confinement. Only when there is sufficient evidence to believe that the person is mentally ill and dangerous to himself or others can he be confined for evaluation. Silence is not penalized; for mere silence, without evidence, cannot lead to confinement.

This case is analogous to *Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). The Court there rejected a Fifth Amendment challenge to a prison disciplinary procedure whereby a prisoner was told that he need not testify, but if he chose not to, his silence might be used against him. The Court stressed that silence alone would not penalize the prisoner, for corrections officers would have to prove by other evidence that disciplinary measures were warranted:

> He [the prisoner] was notified that he was privileged to remain silent if he chose. He was also advised that his silence could be used against him, but a prison inmate in Rhode Island electing to remain silent during his disciplinary hearing, as respondent Palmigiano did here, is not in consequence of his silence automatically found guilty of the infraction with which he has been charged. Under Rhode Island law, disciplinary decisions "must be based on substantial evidence manifested in the record of the disciplinary proceeding." [Citation omitted.]
>
> It is thus undisputed that an inmate's silence in and of itself is insufficient to support an adverse decision by the Disciplinary Board.

425 U.S. at p. 317, 96 S.Ct. at p. 1557. That is true here. A subject's silence, in and of itself, is insufficient to support commitment. In fact, the silence is not used against him, as it is in *Baxter*. The only effect of silence is the elimination of medical testimony from the commitment hearing.

Finally, practical considerations warrant reversal. If the state may not commit a person absent medical evaluation, and if the subject refuses to be examined, then under the district court's ruling, he must be released. Any subject of a commitment petition could avoid commitment merely by refusing to speak. We can imagine the case of a belligerent, hostile person who is the subject of a petition. He may be demon-

---

**5.** This element of the statute has been overlooked by counsel for appellees. In their brief, counsel states:

> In summary, § 334–60(b)(4)(G) penalizes people who want to avoid saying things that might be used to justify deprivation of their unconditional liberty. If they agree to talk, they may go free entirely; if they choose to be silent, and keep their private thoughts, they will surely not be released, *even though the evidence is otherwise inadequate to justify hospitalization.*

Appellees' brief, at p. 52. (Emphasis supplied). That conclusion is belied by the plain meaning of the statute. This argument was repeated to us at oral argument when counsel stated:

> It is only where the state does not have under its own standards, sufficient evidence to justify commitment and where it tries to obtain that evidence against the wishes of the patient through incarceration in a coercive alien environment that it is unconstitutional.

We agree.

strably dangerous to himself or others. His hostility may extend to examining physicians, to whom he refuses to speak. Without some means of evaluating his condition, the purpose of the statute (protecting others from dangerous mentally ill persons) would be defeated. Sound policy reasons demand that this portion of the decision below be reversed.

### III.  *Imminent Dangerousness*

■ The district court struck down § 334–60(b)(1)(B), which spells out the bases for commitment, because the statute failed to specify that the "danger" to self or others be imminent. Citing *Lessard v. Schmidt*, 349 F.Supp. 1078, 1093 (E.D.Wis. 1972), *vacated and remanded for a more specific order*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974), *order on remand*, 379 F.Supp. 1376 (D.C.1974), *vacated and remanded on other grounds*, 421 U.S. 957, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975), *order reinstated on remand*, 413 F.Supp. 1318 (1976), the court held:

> The proper standard is that which requires a finding of *imminent* and *substantial* danger as evidenced by a recent overt act, attempt or threat.

438 F.Supp. at p. 1110. (Emphasis in original.) Finding the statute "ambiguous" as to these standards, the court struck it down.

We agree that the danger must be imminent to justify involuntary commitment. The legislature knew how to require imminence when it wanted to. In the definition of "danger to property" quoted above, the legislature explicitly required the danger to property to be "imminent." Thus it is unreasonable to assume, as the state asks us, that the legislature meant to include an imminence requirement for danger to others or danger to self.[6]

Because it is unconstitutional to commit one who does not pose an imminent danger,

the statute as presently worded is unconstitutional. This portion of the judgment below is affirmed.

### IV.  *Proof Beyond a Reasonable Doubt*

■ The district court held that the state must prove the need for commitment beyond a reasonable doubt. Because the five-day evaluation confinement requires only a showing of "sufficient evidence," the court held the statute unconstitutional.[7]

We have before us, as the trial court did not, the Supreme Court's decision in *Addington v. Texas, supra*, 99 S.Ct. 1804. The court there rejected the contention that the standard of proof in a civil commitment hearing must be beyond a reasonable doubt. Bound by that decision, we reverse the ruling below.

*Addington* held that, while proof need not be beyond a reasonable doubt, the standard must be more than a mere preponderance of the evidence. The Hawaii statute allows for a five-day evaluation period when there is "sufficient evidence" that the subject should be committed.

It is unclear whether this standard meets the requirements of *Addington*, in which the court stated:

> To meet due process demands, the standard has to inform the fact-finder that the proof must be greater than the preponderance of the evidence standard applicable to other categories of civil cases.

441 U.S. at p. 432, 99 S.Ct. at p. 1813.

We should endeavor to find a statute constitutional rather than striking it down. We can construe the present requirement of "sufficient evidence" to mean more than a mere preponderance simply by reading "sufficient" to mean "constitutionally sufficient." We leave further construction to Hawaii courts which will look to *Addington* for guidance.

---

6.  While we note that counsel for the State of Hawaii concede that the danger must be imminent, counsel's promise that the State will read the imminence requirement into the statute is insufficient. It is tor the legislature, not the state's lawyer, to amend the law.

7.  The only portion of the statute which allows for commitment on "sufficient evidence" is the provision in § 344–60(b)(4)(G) which allows for five-day diagnostic commitments. The normal procedure for involuntary commitment requires a showing of proof beyond a reasonable doubt. (§ 334–60(b)(4)(I) ).

## SUMMARY

On balance, we find Hawaii's procedures for the involuntary commitment of dangerous mentally ill individuals in conformity with constitutional rights. With the exception of the "danger to property" provision, and the failure to require imminent danger, the statute strikes the proper balance between protection of society from those who might harm others and preservation of the rights of the mentally ill who are dangerous to none.

The decision in 78–1830 is affirmed in part and reversed in part.

The appeal in 78–3190 is dismissed.

SCHROEDER, Circuit Judge, specially concurring:

I concur in all portions of the Court's opinion except Part II dealing with the privilege against self-incrimination. As to that portion, I concur in the result. I write separately in order to explain what I believe to be the narrowness of the self-incrimination issue before us.

Compulsory psychiatric examinations have received considerable, and conflicting discussion by scholars. E. g., Aronson, Should the Privilege Against Self-Incrimination Apply to Compelled Psychiatric Examinations?, 26 Stan.L.Rev. 55 (1973); Fielding, Compulsory Psychiatric Examination and Civil Commitment and the Privilege Against Self-Incrimination, 9 Gonz.L. Rev. 117 (1973). These discussions highlight a sensitive area in which the dangers of persecution are great and the rights of individuals as well as the safety of society must be observed.

The precise statutory provision challenged here as violative of the Fifth Amendment is a provision requiring that the subject be confined for up to five days for purposes of mental examination if the subject refuses to be examined voluntarily. Haw.Rev.Stat. § 334–60(b)(4)(G).

That provision, must, however, be read in the context of the entire Hawaiian statutory scheme which requires a medical examination of the subject for any involuntary commitment on other than an emergency basis. The medical examination requirement can be waived only by the subject. Thus, as the majority opinion points out, if the subject refuses to waive the examination requirement and refuses to submit to the examination voluntarily, there can, absent a compulsory examination, never be a commitment. Given the medical evidence requirement which has not been challenged in this litigation, I agree that some provision for compulsory examination must also be valid.

The compulsory examination provision in this case is limited by the provision that it may be employed only when there is sufficient external evidence to believe that the person is mentally ill and dangerous. As the majority opinion also points out, any confinement based solely upon a refusal to be examined would be contrary to the most minimal standards of due process. See Baxter v. Palmigiano, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976).

In upholding this restricted use of the involuntary confinement, I read the statute in question to prohibit use of any information gleaned from the examination in any subsequent criminal prosecution. That is the proper interpretation of the last sentence of Haw.Rev.Stat. § 334–60(b)(4)(G) disavowing any limitation on the individual's privilege against self-incrimination.

In short, I view today's decision as limited to upholding an examination, solely for use in a commitment proceeding, when other evidence provides a basis to believe that the individual may be dangerous to himself or society, and when a medical examination is otherwise required as a prerequisite for commitment.

There may well be serious additional questions concerning the duration of such confinement, and, specifically, the discretionary five-day confinement provided for in this statute. However, such questions have not been presented directly in this case and are beyond the proper scope of this decision.

Other cases have considered the applicability of the Fifth Amendment to other

aspects of civil commitment proceedings. *See, e. g., Lessard v. Schmidt*, 349 F.Supp. 1078 (E.D.Wis.1972) (three judge court) (Fifth Amendment requires that a subject be advised that he need not answer the questions posed to him by the doctor and that his answers may be the basis for commitment, but does not entitle him to have an attorney present during the psychiatric interview), *vacated and remanded on other grounds*, 414 U.S. 473, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *French v. Blackburn*, 428 F.Supp. 351 (M.D.N.C.1977) (Fifth Amendment does not require that the subject be warned that his statements to a psychiatrist may be the basis for his commitment), *aff'd. mem.*, 443 U.S. 901, 99 S.Ct. 3091, 61 L.Ed.2d 869 (1979); *Cramer v. Tyars*, 23 Cal.3d 131, 588 P.2d 793, 151 Cal. Rptr. 653 (1979) (Fifth Amendment does not prohibit calling subject as a witness at retardation commitment hearing). Such issues are also, in my view, beyond the scope of the case before us.