[No. 47805–8. En Banc. December 2, 1982.]

*In the Matter of* MARY ANN LEE HARRIS,
*Petitioner.*

*Richard B. Sanders* and *Douglas A. Crowder*, for petitioner.

*Norm Maleng, Prosecuting Attorney*, and *Gerald A. Smith, Deputy*, for respondent.

*Barry Flegenheimer* and *John H. Hertog, Jr.*, on behalf of Seattle–King County Public Defender Association, *Neil R. Sarles* on behalf of the American Civil Liberties Union, and *Richard A. Haworth* on behalf of the Citizen's Commission on Human Rights, amici curiae for petitioner.

UTTER, J.—Petitioner claims the summons procedure for involuntary civil commitment under RCW 71.05.150 violates the due process clause of the federal constitution. We find those procedures constitutionally inadequate and impose the requirement of a judicial finding of "probable dangerousness" before detention in nonemergency situations.

On Friday, May 22, 1981, at 11:30 p.m., a summons issued pursuant to RCW 71.05.150 was served upon petitioner Harris directing her to report to Harborview Hospital. The summons was issued by a county designated mental health professional based on an affidavit of Harris' mother provided 5 days earlier. Petitioner did not so report, which resulted in the issuance of an authorization to take her into custody. Before that "custody authorization"

was exercised, petitioner obtained appointed counsel, who in turn obtained a 7-day temporary restraining order prohibiting King County from apprehending her. The order also provided that if a declaratory judgment action challenging the constitutionality of RCW 71.05 were initiated the restraint would stay in effect until its conclusion. The trial court refused to provide petitioner a show cause hearing.

Petitioner Harris then filed a motion for discretionary review of the trial court's failure to require a show cause hearing. Subsequent to filing the motion, the King County Prosecuting Attorney, who is the respondent here, moved for and obtained an order for voluntary dismissal of the Superior Court detention proceeding.

We overruled a commissioner's ruling denying Harris' motion for discretionary review and accepted review of the case.

## I

Respondent raises a number of threshold inquiries which generally address the propriety of our decision to grant petitioner's motion to modify the commissioner's ruling denying a motion for discretionary review.

Though respondent makes valid points with respect to mootness and the awkward posture of petitioner's appeal, this case "presents a question of a public nature which is likely to recur, and for which an authoritative determination now is desirable for the future guidance of public officers." *In re Patterson*, 90 Wn.2d 144, 149, 579 P.2d 1335 (1978). The need for an authoritative disposition of the constitutionality of RCW 71.05.150 compels us to reach the substantive legal questions regardless of the specific infirmities of this case.

## II

All petitioner's constitutional claims involved the provisions of RCW 71.05.150, setting forth procedures for the "detention of mentally disordered persons for evaluation and treatment". The statute provides, *inter alia*, that a

mental health professional who "receives information alleging that a person, as a result of a mental disorder, presents a likelihood of serious harm to others or himself . . . after investigation . . . may summon such person to appear at an evaluation and treatment facility for not more than a seventy–two hour evaluation and treatment period". RCW 71.05.150(1)(a). RCW 71.05.020(3) defines a "likelihood of serious harm" as either:

> (a) A substantial risk that physical harm will be inflicted by an individual upon his own person, as evidenced by threats or attempts to commit suicide or inflict physical harm on one's self, (b) a substantial risk that physical harm will be inflicted by an individual upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm, or (c) a substantial risk that physical harm will be inflicted by an individual upon the property of others, as evidenced by behavior which has caused substantial loss or damage to the property of others;

If a person summoned does not appear within 24 hours of service, "such person may be involuntarily taken into custody." RCW 71.05.150(1)(b). An individual is entitled to a "probable cause" hearing within 72 hours after detention. RCW 71.05.150(1)(c).

■ There is no question that due process guaranties must accompany involuntary commitment for mental disorders. *In re Levias,* 83 Wn.2d 253, 517 P.2d 588 (1973); *In re Quesnell,* 83 Wn.2d 224, 517 P.2d 568 (1973); *Addington v. Texas,* 441 U.S. 418, 60 L. Ed. 2d 323, 99 S. Ct. 1804 (1979). The United States Supreme Court has described involuntary commitment as "a massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972).

Commitment is designed to be beneficial, but it can be harmful. The injurious effect of commitment can be manifested in a very short time. As testimony before the Senate indicated:

> any kind of forcible detention of a person in an alien

environment may seriously affect him in the first few days of detention, leading to all sorts of acute traumatic and iatrogenic symptoms and troubles. Constitutional Rights of the Mentally Ill: Hearings Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary, 91st Cong., 1st & 2d Sess. 210 (1969–70) (statement of Arthur Elson Cohen, member ACLU). In addition, social stigmatization attaches to those who have been committed because of mental illness. *See Position Statement on Discrimination Against Persons with Previous Psychiatric Treatment,* 135 Am. J. Psychiatry 643 (1978).

### III

Having established a liberty interest, petitioner first contends that since "dangerousness" is not capable of accurate prediction, it may not serve as the basis for depriving an individual of his liberty.

In essence, petitioner argues by the nature of that which is sought to be proved, the prosecution can never meet the standard of "clear, cogent and convincing evidence" mandated by the court in *In re Levias, supra.* In support of this position petitioner cites the lone affidavit of Dr. Rabkin below and numerous law review articles. *See, e.g.,* Ennis & Litwack, *Psychiatry and the Presumption of Expertise: Flipping Coins in the Courtroom,* 62 Cal. L. Rev. 693 (1974); Cocozza & Steadman, *The Failure of Psychiatric Predictions of Dangerousness: Clear and Convincing Evidence,* 29 Rutgers L. Rev. 1084 (1976).

Respondent points out that we have implicitly accepted the uncertainties surrounding psychiatric predictions, yet found such predictions amenable to due process. *In re Patterson, supra; In re Levias, supra.* The United States Supreme Court, while acknowledging this uncertainty, has also found this area of inquiry susceptible to due process. *O'Connor v. Donaldson,* 422 U.S. 563, 45 L. Ed. 2d 396, 95 S. Ct. 2486 (1975); *Addington v. Texas, supra.*

Petitioner's argument would eviscerate the entire

law of involuntary commitment as well as render dubious the numerous other areas where psychiatry and the law intersect. There is no question the prediction of dangerousness has its attendant problems. The American Psychiatric Association has in another context confessed the profession's inability to predict dangerousness precisely. *See* Coleman, *"You'll Thank Us Later": Rationalizing Civil Commitment of the Mentally Disordered,* 4 Hamline L. Rev. 425, 432 (1981). Mental disease does not in itself connote dangerousness, nor is it necessarily a relevant indicia of dangerousness. *See* Giovannoni & Gurel, *Socially Disruptive Behavior of Ex–Mental Patients,* 17 Archives Gen. Psychiatry 146 (1967); Rappeport & Lassen, *Dangerousness—Arrest Rate Comparisons of Discharged Patients and the General Population,* 121 Am. J. Psychiatry 776 (1965); Steadman & Keveles, *The Community Adjustment and Criminal Activity of the Baxstrom Patients: 1966–1970,* 129 Am. J. Psychiatry 304 (1972).

Yet fear of the unknown is often greater than fear of the known. The laws of involuntary civil commitment should not reflect these irrational fears of mental illness. *See* Constitutional Rights of the Mentally Ill, *supra.* This court can endeavor to protect against abuse by requiring demonstration of a substantial risk of danger and by imposing procedural safeguards and a heavy burden of proof. *See In re Levias, supra.* But we are not prepared to abandon the possibility of conforming the law of involuntary civil commitment to the requirements of the constitution.

Even if we were to give credence to petitioner's broad claim that dangerousness cannot be predicted, she has not provided the kind of record necessary for the court thoughtfully to consider her claim. We have a doctor's affidavit and a few articles in an appendix. No expert testimony has been provided; the prosecutor has not even had the opportunity to present evidence on the question.

## IV

Assuming dangerousness may provide a basis for com-

mitment, petitioner next claims that dangerousness must be "imminent" and based on a "recent" overt act to justify involuntary detention. In *Suzuki v. Yuen,* 617 F.2d 173 (9th Cir. 1980), the Ninth Circuit struck down a Hawaii statute providing procedures for involuntary commitment because it "failed to specify that the 'danger' to self or others be imminent." 617 F.2d at 178. The court quoted the standard of dangerousness set forth by the district court below in *Suzuki v. Alba,* 438 F. Supp. 1106 (D. Hawaii 1977):

> The proper standard is that which requires a finding of *imminent* and *substantial* danger as evidenced by a recent overt act, attempt or threat.

438 F. Supp. at 1110, citing *Lessard v. Schmidt,* 349 F. Supp. 1078, 1093–94 (E.D. Wis. 1972), *vacated and remanded for a more specific order,* 414 U.S. 473, 38 L. Ed. 2d 661, 94 S. Ct. 713, *order on remand,* 379 F. Supp. 1376 (E.D. Wis. 1974), *vacated and remanded on other grounds,* 421 U.S. 957, 44 L. Ed. 2d 445, 95 S. Ct. 1943 (1975), *order reinstated on remand,* 413 F. Supp. 1318 (E.D. Wis. 1976).

The standard of dangerousness for the summons procedures under RCW 71.05.150, as well as for all other orders of commitment under RCW 71.05 (*e.g.,* RCW 71.05.240—probable cause hearing; RCW 71.05.310—judicial hearing), except for emergency detention under RCW 71.05.150(2)–(5), does not include the condition of "imminence". The standard requires a showing of a "likelihood of serious harm", which is defined as a substantial risk of physical harm to self, others or the property of others. RCW 71.05-.020(3). Since the emergency detention provisions do require a showing of an "imminent likelihood of serious harm", the omission of "imminence" elsewhere in the statute would seem to have been purposeful.

While RCW 71.05's standard of dangerousness (except for its emergency detention provisions) conflicts with the holding in *Suzuki,* we do not feel "imminent" danger is required as a condition of involuntary commitment. The United States Supreme Court has spoken only generally on

the issue, stating involuntary commitment requires a showing that the potential for doing harm is "great enough to justify such a massive curtailment of liberty." *Humphrey v. Cady,* 405 U.S. 504, 509, 31 L. Ed. 2d 394, 92 S. Ct. 1048 (1972).

The many courts that have addressed the question have consistently required a substantial risk of danger to justify involuntary commitment. They have not, however, invariably required a showing of "imminence". *See Stamus v. Leonhardt,* 414 F. Supp. 439, 451 (S.D. Iowa 1976) ("pose a serious threat to themselves or others"); *Mignone v. Vincent,* 411 F. Supp. 1386, 1389 (S.D.N.Y. 1976) ("immediate threat of harm to self, others or society"); *Doremus v. Farrell,* 407 F. Supp. 509, 515 (D. Neb. 1975) ("poses a serious threat of substantial harm to himself or to others"); *Bell v. Wayne Cy. Gen. Hosp.,* 384 F. Supp. 1085, 1096 (E.D. Mich. 1974) (3–judge court) ("causing harm to self or to others") (relying on *Humphrey v. Cady, supra*); *Lynch v. Baxley,* 386 F. Supp. 378, 391 (M.D. Ala. 1974) (3–judge court) (likelihood to "inflict serious harm on himself or on others"); *Dixon v. Attorney General,* 325 F. Supp. 966, 974 (M.D. Pa. 1971) ("poses a present threat of serious physical harm to other persons or to himself").

In addition, subsequent to the decision in *Suzuki v. Yuen, supra,* two state supreme courts rejected the *Suzuki* court's constitutional requirement of "imminence" in favor of a showing of a substantial risk of serious harm. *Hatcher v. Wachtel,* 269 S.E.2d 849 (W. Va. 1980); *Commonwealth v. Nassar,* 406 N.E.2d 1286 (Mass. 1980).

Finally, while we believe the *Suzuki* court's requirement of "imminent danger" reflects a valid constitutional concern for establishing a high standard of danger where the potential deprivation of liberty is great, the practical implications of such a standard might actually undermine liberty interests. The Washington law of involuntary civil commitment requires a showing of "imminent danger" for temporary emergency detentions. RCW 71.05.150(2)–(5). The danger must be impending to justify detention without prior pro-

cess. At the same time, the practical effect of being placed in the hospital will usually eliminate the "imminence" of one's dangerousness. If we were to require "imminent danger" as a requirement of continued commitment, we would be creating a standard that (in many cases) would invalidate commitment as soon as it occurs. While imminence may no longer exist in such cases, the State has a continuing interest in confining those who present a substantial risk of serious physical harm to themselves or others. A standard of "imminent danger" for all commitments would be impracticable. To prevent the release of individuals who remain dangerous, those who administer the mental health system might assimilate "imminent danger" with a "substantial risk [of] physical harm". In so doing, the meaning of "imminence" would be diluted, and citizens would be in jeopardy of emergency detentions without prior process in circumstances where danger is less than impending.

We conclude RCW 71.05's standard of dangerousness provides a valid basis for the involuntary commitment of an individual. The risk of danger must be substantial and the harm must be serious before detention is justified. While dangerousness is difficult to predict, RCW 71.05.020 requires that the "substantial risk [of] physical harm" be "evidenced by behavior" that has caused harm or creates the reasonable apprehension of harm. Many courts have required "a recent overt act" to justify a finding of dangerousness. *See, e.g., Suzuki v. Alba,* 438 F. Supp. 1106, 1110 (D. Hawaii 1977), *aff'd in part, dismissed in part, rev'd in part sub nom. Suzuki v. Yuen, supra; Stamus v. Leonhardt, supra; Lynch v. Baxley, supra; Lessard v. Schmidt, supra. See generally* Note, *Overt Dangerous Behavior as a Constitutional Requirement for Involuntary Civil Commitment of the Mentally Ill,* 44 Chi. L. Rev. 562 (1977). RCW 71.05.020 does not explicitly require that evidence of behavior be recent, although such evidence must be recent to be meaningful. We thus interpret RCW 71.05.020 as requiring a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one

which has caused harm or creates a reasonable apprehension of dangerousness. So construed, we believe the standard of dangerousness contained in RCW 71.05.150 provides a constitutional basis for detention.

## V

Finally, having concluded RCW 71.05's standard of dangerousness comports with substantive due process, we must address petitioner's argument that the summons procedures of RCW 71.05.150(1)[1] violate constitutional safeguards of procedural due process. The test for reviewing the adequacy of the summons procedures has been set forth by the United States Supreme Court. The test involves the balancing of a number of factors.

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge,* 424 U.S. 319, 335, 47 L. Ed. 2d 18, 96 S. Ct. 893 (1976), quoted in *Smith v. Organization of Foster Families,* 431 U.S. 816, 848–49, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977). We have already noted the privacy interest affected by the summons procedure is substantial. Though the summons authorizes detention for only 72 hours, commitment for such a short period of time still constitutes a "massive curtailment of liberty." At the same time, the risk of an erroneous deprivation of this liberty interest is very high under the summons procedures. The mental health professional's decision to issue a summons after "investigation and evaluation" of a complaint is not subject to review prior to detention. No corroboration of that decision is

---

[1]The only procedure we address is that set forth in RCW 71.05.150(1), whereby custody of persons is authorized in "nonemergency" cases. We do not address the procedure of RCW 71.05.150(2) authorizing emergency custody, which section encompasses the vast majority of cases.

needed. The mental health professional must file in court the summons, the petition for initial detention and all documentary evidence, but this is merely a formal requirement and need not occur until after the detention is initiated. RCW 71.05.160. The statute does not require the mental health professional even to attempt to personally interview the person against whom the claim is brought. Nor need the mental health professional exhaust all alternative means to commitment, including persuading the individual to voluntarily submit to examination. The summons itself is not an opportunity to "voluntarily" submit to examination. It is an order, and the individual is compelled to report to the hospital by his or her own means within 24 hours or by forcible apprehension thereafter.

Since the State's interest in detention is not emergent, we can conceive of no reason to justify detention through a summons process without some check on the discretion of the mental health professional. In this case, the mental health professional issued a summons 5 days after receiving a complaint from petitioner's mother. If petitioner had not become a fugitive, she would have been subject to a minimum 6 days' detention (since the summons occurred the Friday night of Memorial Day weekend and the statutory 72–hour period excludes weekends and holidays, RCW 71.05.180).

The record reflects nothing more than the mother's affidavit as the basis for detention. It reflects no attempt by the mental health professional to personally interview Ms. Harris. No effort to persuade Ms. Harris to submit to examination was made. No alternative solutions to defuse the potentially dangerous situation were tried. Based on her mother's affidavit, petitioner's dangerousness existed only in her relationship with her mother, yet no attempt was made to convince either mother or daughter to move to a different residence. The mother has now moved, which apparently has solved any concern for danger.

The power the statute invests in a mental health professional is far greater than is needed to satisfy the State's

interest in nonemergency detention of those who present a likelihood of danger to themselves or others.

█ We hold the summons procedures of RCW 71.05.150 violate constitutional provisions of procedural due process. This does not mean that a person who presents a substantial risk of physical harm to herself or others is not subject to 72–hour evaluation and treatment by summons. But before a summons may issue we require, as a function of our inherent judicial power, a judicial finding of "probable dangerousness".[2] Such a requirement has been imposed in a similar context by the Minnesota Supreme Court, *see State ex rel. Doe v. Madonna,* 295 N.W.2d 356 (Minn. 1980), and the Lanterman–Petris–Short Act, upon which our involuntary civil commitment law was modeled, provides similar safeguards. *See* Cal. Welf. & Inst. Code § 5202 (West Supp. 1982), § 5206 (West 1972).

One may question the value of such a judicial finding. What insight can a judge provide for a determination that is ultimately medical? *Parham v. J.R.,* 442 U.S. 584, 609, 61 L. Ed. 2d 101, 99 S. Ct. 2493 (1979). Would not a judicial finding of probable dangerousness simply add another administrative burden with little additional protection for the individual since judges will generally defer to the recommendation of the mental health professional? *See* Hiday, *Reformed Commitment Procedures: An Empirical Study in the Courtroom,* 11 Law & Soc'y Rev. 651 (1977).

While a magistrate may not be any better than a mental health professional at predicting whether a person presents a substantial likelihood of physical harm to herself or others, we do feel a magistrate can play an important role in the predetention process. The potential curtailment of liberty requires the intervention of an impartial third party to ensure not only that probable dangerousness exists, but

---

[2]Other courts have also imposed appropriate constitutional safeguards for involuntary detention when the statute was found unconstitutional. *See, e.g., Kendall v. True,* 391 F. Supp. 413, 419 (W.D. Ky. 1975); *Lynch v. Baxley,* 386 F. Supp. 378, 397 (M.D. Ala. 1974).

that sufficient investigation has occurred, and that commitment is the least restrictive alternative. These are uniquely judicial concerns that will ensure the system is not abused. In a similar setting, we have required a demonstration that an individual is the probable father of an illegitimate child and that all "less drastic means" have been used to convince the individual to attend filiation proceedings before issuing a warrant. *See State v. Klinker,* 85 Wn.2d 509, 522, 537 P.2d 268 (1975). *See also Covington v. Harris,* 419 F.2d 617 (D.C. Cir. 1969); Chambers, *Alternatives to Civil Commitment of the Mentally Ill: Practical Guides and Constitutional Imperatives,* 70 Mich. L. Rev. 1107 (1972).

The exhaustion of less restrictive alternatives to involuntary 72–hour detention is essential both to due process and to the integrity of our mental health system. The best interests of the mentally ill lie more often than not in treatment that does not involve commitment. Voluntary avenues must be explored before invoking the mandate of involuntary commitment. If commitment is always associated with force, those who need help may be diverted from seeking assistance. *See* Coleman, *"You'll Thank Us Later": Rationalizing Civil Commitment of the Mentally Disordered,* 4 Hamline L. Rev. 425, 447 (1981). This case is illustrative. Ms. Harris' only previous commitment experience was involuntary, and it left her with a lasting fear of commitment. It is not surprising that she became a fugitive when ordered to report to the hospital.

We hold in a nonemergency situation a summons may issue under RCW 71.05.150 only after a magistrate is satisfied that the individual probably presents a substantial likelihood of physical harm to himself or others, that sufficient investigation and documentation has occurred to

establish this probability, and that all less restrictive means to commitment have been exhausted.[3]

BRACHTENBACH, C.J., and ROSELLINI, STAFFORD, DOLLIVER, WILLIAMS, DORE, DIMMICK, and PEARSON, JJ., concur.

[3]Amicus on behalf of ACLU urges that a full–fledged probable cause hearing, such as the adversarial proceeding required by RCW 71.05.240, is required before the 72–hour detention. We disagree. Such a right is provided within 72 hours of detention under the statute. The 72–hour period represents a period of evaluation in which to examine the question of dangerousness. We do not feel it is realistic to expect the State ever to meet its burden of proof without the opportunity for careful examination of the individual. To impose the requirement of a probable cause hearing prior to the initial 72–hour detention would create a procedural barrier to ever detaining for 72 hours an individual who presents a substantial likelihood of physical harm to himself or others. *Vitek v. Jones,* 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980) and *Harmon v. McNutt,* 91 Wn.2d 126, 587 P.2d 537 (1978) are not to the contrary. While the courts in those cases held a probable cause hearing was required before transferring a prisoner to a mental health facility, no such hearing was required prior to the initial examination of the individual in the prison hospital.