[Civ. No. 69961. Second Dist., Div. Five. Nov. 15, 1983.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CARL LEE DODSON, Real Party in Interest.

COUNSEL

Robert H. Philibosian, District Attorney, Arnold T. Guminski, Maurice H. Oppenheim and Howard M. Kelner, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, Kenneth S. Star and Ronald B. Davey, Deputy Public Defenders, for Real Party in Interest.

OPINION

**HASTINGS, J.**—This proceeding addresses the issue of whether section 5300 of the Welfare and Institutions Code,[1] which permits involuntary confinement of mentally disordered persons for treatment for up to 180 days, satisfies constitutional standards of due process.

Section 5300 proceedings represent the third level in a comprehensive statutory program for the confinement and treatment of those suffering from dangerous and acute mental disorders. The initial step in such proceedings is prescribed in section 5150 which provides, so far as is here relevant, for 72-hour detention of dangerous mentally disordered persons for treatment and evaluation.

Following evaluation pursuant to section 5150 et seq., a person may, under certain conditions, be certified, pursuant to section 5250, for not more

---

[1]All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

than 14 days of involuntary intensive treatment related to the mental disorder. Section 5300, the statute here under review, provides in pertinent part: "At the expiration of the 14-day period of intensive treatment, a person may be confined for further treatment pursuant to the provisions of this article for an additional period, not to exceed 180 days if he or she:

"(a) Has attempted, inflicted, or made a substantial threat of physical harm upon the person of another after having been taken into custody, and while in custody, for evaluation and treatment, and who, as a result of mental disorder, presents a demonstrated danger of substantial physical harm to others, or

"(b) Had attempted, or inflicted physical harm upon the person of another, that act having resulted in his or her being taken into custody and who presents, as a result of mental disorder, a demonstrated danger of substantial physical harm to others. . . ."[2]

Real party in interest was initially taken into custody, pursuant to section 5150, because he physically attacked a psychiatrist at a Veterans' Administration Hospital, striking him about the head with his fists and with a pen, causing profuse bleeding. The record establishes that real party did not know and had had no prior contact with the doctor he attacked, but that he wanted "to kill a doctor."

His detention was extended for 14 days pursuant to section 5250. During the 14 days, the section 5300 petition was filed, supported by a report from Dr. Jeffery Wilkins, the doctor in charge of the hospital unit in which real party was confined, and affidavits from a number of other persons including real party's mother and Dr. Mark Mills, the chief of the psychiatric service at the hospital.

Dr. Wilkins' report recites that real party was diagnosed as a paranoid schizophrenic in 1977, that he has a history of hospitalizations dating back to that time, and that his symptoms manifest themselves in "episodes of violent and/or assaultive behavior, explosive outbursts, threatening behaviors including death threats, a long term or possibly irreversible delusional system centered on concerns that people are 'harassing' him and trying to take away his funds and/or government pensions, paranoid thinking and chronic suspiciousness, total lack of insight and violent behavior as a means of coping with his paranoid ideation." His initial hospital admission in 1977

---

[2]"Demonstrated danger" is defined in section 5300.5, subdivision (c) as follows: "Demonstrated danger may be based on assessment of present mental condition, which is based upon a consideration of past behavior of the person and other relevant evidence."

came as a result of his having slit the throat of a navy paymaster in the delusional belief that he had been directed to do so by his superior officers. He was also hospitalized for varying lengths of time in 1979, 1980, 1981, and 1982 as a result of psychotic episodes of either threatened or perpetrated violence toward others. In May and June of 1983, he attempted to break his mother's arms and he repeatedly threatened to kill her. During the 14-day (§ 5250) commitment, in response to Wilkins' attempts to discuss real party's need for antipsychotic medication, real party stated, "now I know why doctors like you need to be killed."

Wilkins' report concluded with the following evaluation: "I believe Mr. Dodson represents an immediate threat to other individuals, especially those persons involved with his funding and social supports, including his mother. In conjunction with consultation from the Chief of Psychiatry of this medical center we believe he is dangerous to others based upon a 'fixed' delusional system secondary to a chronic psychotic mental illness. The patient has no insight into his illness and has not demonstrated a desire or ability to seek or continue with treatment especially if involving antipsychotic medication. When confronted with his most recent assault on the doctor, Mr. Dodson admits it was unprovoked and did not involve someone he knew. He stated that the doctor was an 'example' and it 'had to be done' to bring attention to the harassment he is receiving."

The affidavit from Dr. Mills, the chief of the psychiatry service alleges: "On the basis of my knowledge of Mr. Dodson's case history, my interview with him, and the additional discussion with his treating staff, I have reached the following opinions about him:

"a. Mr. Dodson is presently suffering from significant mental disorder.

"b. Because of Mr. Dodson's suspiciousness, hypervigilance, and the presence of delusions, his illness is best conceptualized as being of psychotic proportion.

"c. Because of Mr. Dodson's great suspiciousness (paranoia) it is difficult to assess the precise nature of his psychotic state; however, his diagnosis is probably paranoia (DSM-III, No. 297.0) or schizophrenic disorder, paranoid subtype (DSM-III No. 295.3).

"d. In my presence Mr. Dodson stated repeatedly words to the effect that his assault on Jerome Lance, M.D., was an 'example,' and that if he needed to make further examples, he would 'do so.' During my interview with him, he manifested no remorse; nor did he express any insight into the nature of his behavior, or into the effects that it might have on others.

"e. Further, Mr. Dodson stated repeatedly that if released he would not continue with his medications.

"f. Mr. Dodson stated on several occasions words to the effect that others would get what was coming to them also.

"g. Based upon these observations and upon my impression of his demeanor, and upon my knowledge of his threatening the Ward Chief's life, I believe that Mr. Dodson constitutes a serious and significant danger to others.

"h. I also believe after reading the relevant section of the California Welfare and Institution Code, Section 5300 et seq. that Mr. Dodson solidly fits the criteria for 180 day post-certification commitment.

"i. In summary then, in my professional opinion Mr. Dodson is seriously psychiatrically ill, that he is dangerous, and that he should *not* be released." (Italics in original.)

Real party moved to dismiss the section 5300 petition. The heart of real party's argument was that the standard for confinement enunciated in the statute—"presents a demonstrated danger of substantial physical harm to others"—was unconstitutional because it looked to the individual's past conduct, rather than to future behavior, and that due process prohibits involuntary confinement except upon a showing of "imminent danger." Real party relied on *Suzuki* v. *Yuen* (9th Cir. 1980) 617 F.2d 173, wherein the Ninth Circuit did indeed state "that the danger must be imminent to justify involuntary commitment." (617 F.2d at p. 178.)

Section 5300 contained the phrase "imminent danger" until amended in 1982 by the substitution of the phrase "demonstrated danger." Respondent court found *Suzuki* v. *Yuen, supra,* 617 F.2d 173, controlling, found deletion of the phrase "imminent danger" from section 5300 significant, declared section 5300 unconstitutional, and ordered the petition dismissed, but stayed enforcement of the order for one week so that the People would have an opportunity to seek appellate review. The instant petition for writ of mandate was the result.

 Although recognizing that the order of dismissal was appealable, petitioner urges that appeal is an inadequate remedy because of society's need for an immediate determination of the validity of the standard for commitment under section 5300. Petitioner further argues that respondent exceeded its jurisdiction by declaring section 5300 unconstitutional and that mandate therefore lies.

■ When a decision is immediately reviewable on appeal, that remedy is considered adequate, absent a showing of special circumstances. (*Phelan v. Superior Court* (1950) 35 Cal.2d 363 [217 P.2d 951].) ■ We agree with petitioner that such special circumstances exist here. Respondent's ruling will have impact on all section 5300 cases brought in the respondent court until an appellate ruling is handed down. Such cases will always be of an urgent nature requiring immediate action for the well-being both of the individual whose confinement is sought and for society at large.[3] Under the circumstances, we concluded that appeal of respondent's ruling would not adequately serve the interests of real party or of society.

We further concluded that respondent court applied *Suzuki* v. *Yuen, supra,* 617 F.2d 173, far too mechanically, that the language of section 5300 can withstand constitutional scrutiny, that respondent therefore abused its discretion in declaring the statute unconstitutional, and that mandate accordingly would lie. We therefore issued an alternative writ and calendared the matter for oral argument.[4]

■ We note initially that a state court is not required to follow the decisions of lower federal courts on constitutional issues. (*People* v. *Tremayne* (1971) 20 Cal.App.3d 1006, 1014 [98 Cal.Rptr. 193].) Thus *Suzuki* v. *Yuen, supra,* 617 F.2d 173, is not binding upon this court, nor was it binding on respondent court.[5] We turn therefore for guidance to the United States Supreme Court.

■ We start with the following proposition: "The essence of federalism is that states must be free to develop a variety of solutions to problems and not be forced into a common, uniform mold. As *the substantive standards for civil commitment may vary from state to state,* procedures must be allowed to vary *so long as they meet the constitutional minimum.*" (Italics added.) (*Addington* v. *Texas* (1979) 441 U.S. 418, 431 [60 L.Ed.2d 323, 331, 99 S.Ct. 1804].) The Supreme Court has never formally defined that

---

[3]Recognizing this sense of urgency, the Legislature has provided that proceedings on a section 5300 petition shall be held within 4 judicial days of the filing of the petition, unless the subject of the petition requests a jury trial, in which case the proceedings must commence within 10 days, unless the attorney for the subject requests a continuance, which may not exceed an additional 10 days. Pending a decision on the petition, the subject is to continue to be treated in an intensive care facility unless released by order of the superior court. (§ 5303.)

[4]We also ordered that real party, who was at the time still confined at the veteran's hospital, remain so confined during the pendency of this matter, "except upon a factual showing in respondent court that the conditions for confinement pursuant to section 5300 do not exist, or that confinement in some other medical facility is more suitable."

[5]The State of Washington expressly rejected the Ninth Circuit's requirement of "imminent danger" in an opinion which cites numerous other formulations of the constitutional standard by state and lower federal courts. (*In re Harris* (1982) 98 Wn.2d 276 [654 P.2d 109].)

"constitutional minimum," but its basic elements can be distilled from other Supreme Court decisions.

In *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], a case which reviewed the procedural prerequisites for continued confinement of a mentally ill person at the expiration of a prison term, the court stated that Baxstrom could not be further confined "without a judicial determination that he is dangerously mentally ill" (383 U.S. at p. 110 [15 L.Ed.2d at p. 623]) and elsewhere defined the requisite standard as a showing that he "is presently mentally ill and such a danger to others that the strict security of a Department of Correction Hospital is warranted." (383 U.S. at p. 115 [15 L.Ed.2d at p. 623].) In *Humphrey* v. *Cady* (1972) 405 U.S. 504 [31 L.Ed.2d 394, 92 S.Ct. 1048], the court approved by inference a Wisconsin statute that conditioned confinement "not solely on the medical judgment that the defendant is mentally ill and treatable, but also on the social and legal judgment that his potential for doing harm, to himself or to others, is great enough to justify such a massive curtailment of liberty." (405 U.S., at p. 509 [31 L.Ed.2d at p. 402].) The minimal constitutional standard indicated by these decisions is a current mental illness which creates a serious potential of substantial harm to others.

In *Minnesota* v. *Probate Court* (1940) 309 U.S. 270 [84 L.Ed. 744, 60 S.Ct. 523, 126 A.L.R. 530], the court reviewed a Minnesota statute permitting commitment of those with "psychopathic personality." The statute, as interpreted by the courts of Minnesota, defined the term "psychopathic personality" to apply to "'those persons who, by an habitual course of misconduct in sexual matters, have evidenced an utter lack of power to control their sexual impulses and who, as a result, *are likely to attack or otherwise inflict injury,* loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.'" (Italics added.) (309 U.S. at p. 273 [84 L.Ed. at p. 749].) The court upheld the statute against claims that it was vague and that it denied due process. Particularly important to our consideration of the validity of section 5300 is the following language from *Minnesota* v. *Probate Court, supra,* in which the Supreme Court discussed the evidentiary showing which would be called for under the Minnesota statute: "There must be proof of a 'habitual course of misconduct in sexual matters' on the part of the persons against whom a proceeding under the statute is directed, which has shown 'an utter lack of power to control their sexual impulses,' and hence that they 'are likely to attack or otherwise inflict injury, loss, pain or other evil on the objects of their uncontrolled and uncontrollable desire.' *These underlying conditions, calling for evidence of past conduct pointing to probable consequences are as susceptible of proof*

*as many of the criteria constantly applied in prosecutions for crime."* (Italics added.) (309 U.S. at p. 274 [84 L.Ed. at p. 749].)

Nowhere in its decisions does the Supreme Court define the danger which must be posed to justify involuntary commitment as "imminent," nor does it otherwise attempt to delineate a time frame within which the danger would be realized were the person released.

The fault we find with the Ninth Circuit's insistence in *Suzuki* v. *Yuen, supra,* 617 F.2d 173, on legislative use of the term "imminent danger" is that it is merely a descriptive phrase, not a precise or quantifiable measurement of either mental condition or potential for harm. The constitution dictates the conditions which must exist before a state may act in certain ways. But it does not dictate the language which courts and legislators must invariably use to describe those conditions. Rarely, if ever, will there be only a single word or phrase capable of describing the constitutional standard. Use of the phrase "imminent danger" may be constitutionally adequate to describe the requisite condition, but it is not constitutionally compelled. Other language can describe the constitutional standard equally well.

We find that the language of section 5300 is sufficient to the task. It permits confinement only of one who has inflicted or threatened harm to others and then only if "as a result of mental disorder," the person *"presents* a demonstrated danger of substantial physical harm to others." (Italics added.) The elements of present illness and potential danger are both provided for.

Real party asserts that the phrase "demonstrated danger" looks to the past rather than the future, and argues that the statute would permit confinement of one who was once dangerous, but is no longer. Real party's argument would require a strained and unrealistic interpretation of the statute. The statute makes clear that past conduct is relevant only as a prognosticator of probable future behavior, a constitutionally valid evidentiary consideration, as noted. (*Minnesota* v. *Probate Court, supra,* 309 U.S. 270, 274 [84 L.Ed. 744, 749].)

One of the principal difficulties that courts and legislatures alike confront in attempting to define and measure the danger which must exist before a mentally ill person can be involuntarily committed is "the lack of certainty and the fallibility of psychiatric diagnosis . . . ." (*Addington* v. *Texas, supra,* 441 U.S. 418, 429 [60 L.Ed.2d 323, 333]; *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352].) The fact that psychiatric predictions are imprecise does not, however, prevent society from protect-

ing itself from those who are dangerously mentally ill. (*Addington* v. *Texas, supra*; *People* v. *Burnick, supra*.)[6]

By substituting the phrase "demonstrated danger" for "imminent danger" in section 5300, the Legislature shifted from a focus on the necessarily imprecise element of psychiatric prognostication to an emphasis on the evidentiary underpinnings of the diagnosis; from that which is least capable of proof, to that which is most capable of proof. In so doing, the statute did not sacrifice the element of immediacy in the danger perceived. The statute still requires that the individual be suffering from a current mental disorder which constitutes a present danger.

■ The section 5300 petition and supporting affidavits filed by the People herein constitute a prima facie showing that the standards for confinement pursuant to section 5300 exist. Respondent abused its discretion in granting real party's motion to dismiss.

Let a peremptory writ of mandate issue directing respondent court to vacate its order of August 15, 1983, dismissing the section 5300 petition and to enter a new and different order denying the motion to dismiss and calendaring the matter for further hearings pursuant to section 5300; except that at any such hearings the People shall produce updated medical evidence reflective of real party's mental condition as of the time of the hearing.

For the reasons given in explaining our decision to proceed in this matter by way of extraordinary writ, and in order "to prevent mootness or to prevent frustration of the relief granted" this decision is hereby made final as to this court forthwith. (Rule 24(a), Cal. Rules of Court.)

Stephens, Acting P. J., and Ashby, J., concurred.

The petition of real party in interest for a hearing by the Supreme Court was denied December 15, 1983.

---

[6]Both the California and United States Supreme Courts have adopted an enhanced standard of proof in involuntary commitment cases (reasonable doubt in California [*Conservatorship of Roulet* (1979) 23 Cal.3d 219 (152 Cal.Rptr. 425, 590 P.2d 1); *People* v. *Burnick* (1975) 14 Cal.3d 306 (121 Cal.Rptr. 488, 535 P.2d 352)]; clear and convincing evidence in the federal courts [*Addington* v. *Texas, supra,* 441 U.S. 418, 427 (60 L.Ed.2d 323, 332)]), partly to compensate for imprecision of psychiatric prognostication.