IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| In the Matter of the Detention of | No. 82393-1-I |
|---|---|
| J.R.K. | DIVISION ONE |
| | UNPUBLISHED OPINION |

CHUN, J. — J.K. threatened, choked, and repeatedly hit his mother. The State petitioned for 14 days of involuntary treatment. The trial court held a hearing and granted the petition, finding that J.K. posed a likelihood of serious harm to others. J.K. appeals the order, arguing that substantial evidence does not support this finding. For the reasons discussed below, we affirm.

## I. BACKGROUND

J.K. is in his early 20s, has a mental health history—including a 2020 diagnosis of schizophrenia, paranoid type—and usually lives with his grandmother. On January 15, 2021, he went to his mother M.K.'s house looking for something to eat. During the visit, she received a telephone call from a friend who said that J.K. had been jumping the friend's fence. M.K. called a mental health crisis center. J.K. spoke to the center for 30 minutes. Afterward, M.K. suggested they go to the hospital for further evaluation, but J.K. said he was fine and just wanted something to eat.

Citations and pin cites are based on the Westlaw online version of the cited material.

A while later, M.K. noticed J.K. pacing around the house and touching his coat pocket. J.K. took a nap. Once he was asleep, M.K. looked in his pocket and found a gun. Fearing for their safety, M.K. took the gun and hid it in her car. When J.K. awoke, he noticed the gun was missing and began yelling and demanding M.K. give back the gun. J.K. claimed he needed the gun for safety and protection. M.K. testified that he repeatedly hit her in the face and choked her as he asked where the gun was. He also said that he would hurt her if she did not return the gun. Eventually, M.K. called a friend who notified law enforcement. Law enforcement arrested J.K.

On January 19, J.K. was admitted to Cascade Behavioral Health Hospital after being evaluated in jail. According to the Petition for Initial Detention, J.K. displayed symptoms of a behavioral health disorder characterized by "impaired judgment, impulsivity, psychotic thought process including paranoia, ideas of reference, persecutory delusions, impaired reality testing, and impaired insight."

Cascade detained J.K. for 72 hours of psychiatric evaluation and treatment. Later, the State petitioned for another 14 days of involuntary treatment, alleging that J.K. suffered from a mental disorder and posed a likelihood of serious harm to others. The State also alleged that J.K. is "gravely disabled," but it later dropped this allegation.

On January 26, the trial court held a hearing on the State's 14-day commitment petition.

During the hearing, M.K. testified about the events preceding J.K.'s commitment. She said that, after finding the gun, she was "so scared" for both her and J.K.'s safety. She also said that she "did not know what was going to happen or if he was going to do anything."

Dr. Robert Beattey, a licensed clinical psychologist employed by Cascade as a court evaluator, testified. Beattey said that J.K. had been previously diagnosed with schizophrenia, paranoid type during a two-month stay at Harborview in 2020 and that remains his diagnosis. He also said that, in his evaluation, J.K. denied having a mental health history and described the incident with M.K. simply as an overreaction on his part.

Beattey testified that during J.K.'s time at Cascade, he repeatedly refused to take medication. According to the medical notes Beattey read out loud at the hearing, doctors and nurses at Cascade noted J.K.'s refusal to take both his morning and nightly doses of Risperdal, an antipsychotic medication, on January 21, 22, and 23. On January 24, a nurse noted that he took the medication but suspected he was "cheeking" them instead of swallowing them.

Beattey testified that in his opinion, J.K.'s mental health impairments had a substantial adverse effect on his cognitive and volitional functioning. Also, in his opinion, J.K. presented a likelihood of serious harm to others as a result of his mental impairment. Beattey based this opinion on the fact that J.K. displayed symptoms of psychosis and paranoia, which led J.K. to believe he needed to protect himself. Beattey testified that this created the potential for violent actions

3

and a serious risk to others, as shown by his willingness to choke and strike M.K. Beattey also testified that, to his knowledge, J.K. had not been aggressive or threatening since arriving at Cascade.

J.K. testified that he did not recall choking M.K. but admitted to hitting her in the face a few times. He said that he was "not opposed" to taking medication and that he would take medication if the court ordered him to do so. But he seemed to express some hesitancy, saying "if I'm prescribed something, I guess, I mean, I kind of guess I don't really have a say much . . . I just don't know . . . I would prefer not . . . but I mean, you gotta do what you gotta do."

After the hearing, the trial court found that the State proved by a preponderance of evidence that, as a result of a mental disorder, J.K. presented a likelihood of serious harm to others. It ordered J.K. to 14-day involuntary commitment.

## II. ANALYSIS

J.K. contends that substantial evidence does not support the trial court's factual finding that because of a mental disorder, J.K. posed a "likelihood of serious harm" to others. Thus, he says, the court's findings of fact do not support its conclusion that J.K. should be committed for 14 days. We disagree.[1]

"Appellate review of the trial court's ruling on involuntary commitment is limited to determining whether substantial evidence supports the findings, and, if

---

[1] Preliminarily, the State does not contend that J.K.'s appeal is moot because his 14-day commitment has ended. See In re Det. of B.H., 18 Wn. App. 2d 46, 49, 488 P.3d 887 (2021) ("[The] appeal is not moot . . . [d]ue to the collateral consequences that can result for a commitment order.").

so, whether those findings support the conclusions of law and judgment." In re Det. of T.C., 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). "Substantial evidence is 'evidence that is in sufficient quantum to persuade a fair-minded person of the truth of the declared premise.'" Id. (quoting In re Det. of A.S., 91 Wn. App. 146, 162, 955 P.2d 836 (1998)). "The burden is on the challenging party to demonstrate that substantial evidence does not support a finding of fact." Id. In general, "[we] must defer to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of evidence." Prostov v. Dep't of Licensing, 186 Wn. App. 795, 820, 349 P.3d 874 (2015).

Under RCW 71.05.240(4)(a), a court must order a person to 14 days of involuntary treatment "if the court finds by a preponderance of the evidence that such person, as the result of a behavioral health disorder, presents a likelihood of serious harm." The "[l]ikelihood of serious harm" is a "substantial risk that . . . physical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm." RCW 71.05.020(36)(a)(ii). RCW 71.05.020 requires a showing of a substantial risk of physical harm as evidenced by a recent overt act. T.C., 11 Wn. App. 2d at 57. "'This act may be one which has caused harm or creates a reasonable apprehension of dangerousness.'" Id. (quoting In re Det. of Harris, 98 Wn.2d 276, 284–85, 654 P.2d 109 (1982)). For example, in T.C., this court held that an aggressive outburst in which T.C. said, "[T]his is why places get shot up," combined with

expert testimony that T.C. posed a substantial risk of physical harm, supported the court's 14-day commitment order.  Id.

Substantial evidence supports the trial court's finding that J.K. posed a likelihood of serious harm to others.  This is evidenced by his recent overt act of threatening, hitting, and choking his mother to regain possession of a gun.  As Beattey testified, J.K. suffers from paranoid schizophrenia, which caused symptoms including paranoia and delusional thinking.  These symptoms led to J.K. attacking M.K.  And M.K. testified that she feared for her safety as a result of J.K.'s behavior.  As the State correctly points out, not only did J.K. place another person in reasonable fear of sustaining harm, J.K.'s actions caused harm to another when he hit and choked M.K.

J.K. contends that there is no substantial risk he would physically harm others because, since his admission to Cascade, he had not behaved aggressively or threatened anyone.  But this ignores the fact that J.K. threatened, hit, and choked M.K. only days before his commitment.  J.K. cites no law supporting the notion that a person does not pose a substantial risk of harm to others simply because they were non-aggressive after commitment.

J.K. also contends that he does not pose a substantial risk of physical harm to another because he is willing to take prescribed medication and does not possess paranoid thoughts about his own safety.  But according to Beattey, J.K. repeatedly refused to take medication while at Cascade.  And at the hearing, despite testifying that he was not opposed to taking medication, J.K. seemed

6

hesitant.  Also, Beattey testified that while J.K. now denies having paranoid concerns for his safety, those symptoms were recently present, and without medical intervention they would persist.  Beattey said that without better symptom management, it would be unsafe for J.K. to be in the community.

We affirm.

_Chun, J._

WE CONCUR:

_Verellen, J_        _Appelwick, J._

7