IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

|  |  |  |
|---|---|---|
| In the Matter of the Involuntary Treatment of | ) ) ) ) | No. 33439-2-III |
| R. Y.[†] | ) ) ) | UNPUBLISHED OPINION |

SIDDOWAY, J. — Mental illness alone is not a constitutionally adequate basis for involuntary commitment of an individual, nor is it enough to show that care or treatment of a person's mental illness would be in his or her best interest. Washington law does, however, authorize involuntary commitment when a person is gravely disabled by a mental disorder that presents a danger of serious physical harm resulting from his or her failure to provide for essential human needs of health or safety.

This case requires us to determine whether the State, in petitioning to extend the involuntary commitment of Ryan Yoder (a pseudonym), presented evidence sufficient to establish he was in danger of serious physical harm, or established only that extending his

---

[†] A Motion to Change Caption and to Refer to Appellant by Initials was filed by R.Y. and was referred to the panel. We grant the motion, although we choose to use a pseudonym rather than initials in the body of the opinion.

commitment would be in Mr. Yoder's best interest. We agree with Mr. Yoder that the State's evidence was constitutionally insufficient. Although Mr. Yoder was released before this appeal could be heard, the appeal remains viable because of the potential future consequences of the superior court's order.[1] We reverse.

## FACTS AND PROCEDURAL BACKGROUND

Ryan Yoder is a 67-year-old man who has been diagnosed with two mental illnesses. One is post-traumatic stress disorder associated with his military service in Vietnam. The other is "schizoaffective disorder or bipolar disorder," which were described in proceedings below as "very similar." Clerk's Papers (CP) at 17. He was hospitalized for mental illness two times within the three years prior to the commitment extension at issue in this case. Following the completion of the second hospitalization in December 2014, Mr. Yoder's commitment was extended for an additional 90 days under a less restrictive alternative (LRA) to involuntary intensive treatment. He was remanded to Paul's Place, an assisted living facility in Colfax, for treatment.

This appeal arises out of an extension of that commitment to an LRA. Before the 90-day treatment ordered by the court expired, Jim Trivelpiece, a designated mental

---

[1] "An individual's release from detention does not render an appeal moot where collateral consequences flow from the determination authorizing such detention." *In re Det. of M.K.*, 168 Wn. App. 621, 626, 279 P.3d 897 (2012). Under RCW 71.05.012, .212. and .245, "each order of commitment entered up to three years before the current commitment hearing becomes a part of the evidence against a person seeking denial of a petition for commitment." *M.K.*, 168 Wn. App. at 626.

2

health professional[2] who worked with Mr. Yoder at Paul's Place, petitioned the Whitman County Superior Court to extend Mr. Yoder's LRA detention by 180 days. The petition alleged that continued detention was warranted because Mr. Yoder was gravely disabled due to repeated and escalating loss of cognitive or volitional control over his actions.

A hearing on the petition was conducted on May 7, 2015. Mr. Trivelpiece and another designated mental health professional, Kelly Heinlen, testified for the State. They testified that Mr. Yoder was very concerned about a government conspiracy because he felt "his detention was illegal" and "there was no basis for it." Report of Proceedings (RP) at 20. The most serious example provided of Mr. Yoder's occasional symptoms of psychosis was his report to Mr. Trivelpiece that in his last hospitalization, surgeons had implanted an electronic device in him that broadcasts his thoughts to Twitter. Both professionals agreed he was doing well recently, although they tended to attribute that to the terms of his commitment at Paul's Place. Additional aspects of their testimony are discussed below, in connection with the focus of the dispute on appeal.

---

[2] "Designated mental health professional[s]" are "mental health professional[s] designated by the county or [the regional support network] to perform the duties specified in [chapter 71.05 RCW]," which deals with evaluation, treatment and commitment of individuals with mental illness. RCW 71.05.020(11). There was testimony at the hearing below that designated mental health professionals have clinical training "in assessing mental illness, assessing dangerousness, danger to self, danger to others, grave disability." Report of Proceedings (RP) at 13.

At the conclusion of the hearing, the trial court orally ruled, finding that the evidence did not support a finding that Mr. Yoder was gravely disabled by virtue of repeated and escalating loss of cognitive or volitional control, as alleged in Mr. Trivelpiece's petition. It did find sufficient evidence that Mr. Yoder had a pattern of decompensating to the point where hospitalization was required, however, and concluded that this pattern established that he was gravely disabled.

Findings and conclusions and an order of involuntary treatment were presented by the State and entered by the court. The court's conclusion, based on its findings, was that Mr. Yoder "is gravely disabled." CP at 16. The court extended the LRA for an additional 90 days, rather than the 180-day extension requested.

Mr. Yoder appeals.

## ANALYSIS

"[I]nvoluntary commitment for mental disorders is a significant deprivation of liberty which the State cannot accomplish without due process of law." *In re LaBelle*, 107 Wn.2d 196, 201, 728 P.2d 138 (1986) (citing *Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984); *In re Det. of Harris*, 98 Wn.2d 276, 654 P.2d 109 (1982)). Although the State has a legitimate interest under its parens patriae powers "in providing care to those who are unable to care for themselves . . . mental illness alone is not a constitutionally adequate basis for involuntary commitment." *LaBelle*, 107 Wn.2d at 201. Accordingly, "a State cannot constitutionally confine without more a nondangerous

4

individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." *O'Connor v. Donaldson*, 422 U.S. 563, 576, 95 S. Ct. 2486, 45 L. Ed. 2d 396 (1975).

To this end, the overarching approach of chapter 71.05 RCW is that individuals may be involuntarily committed for mental health treatment (or their commitment may be extended) for limited periods of time, based on probable cause that they present a likelihood of serious harm or are gravely disabled, subject to a right to legal representation and an early hearing at which the State must prove the likelihood of serious harm or grave disability.

In the context presented here—an extension of commitment to an LRA—the State may prove, and undertook to prove here, that Mr. Yoder "[c]ontinues to be gravely disabled." RCW 71.05.320(3)(d). The grave disability must be shown by clear, cogent, and convincing evidence, meaning that the ultimate fact in issue is shown to be "highly probable." *LaBelle*, 107 Wn.2d at 209; RCW 71.05.310; *Morris v. Blaker*, 118 Wn.2d 133, 137, 821 P.2d 482 (1992).

"Gravely disabled" is defined in chapter 71.05 RCW as being present in two distinct circumstances; it is a condition in which a person, as a result of a mental disorder:

> (a) "[i]s in danger of serious physical harm resulting from a failure to provide for his or her essential human needs of health or safety" or
>
> (b) "manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over his or

5

her actions and is not receiving such care as is essential for his or her health or safety."

RCW 71.05.020(17). As previously noted, the trial court orally ruled that the evidence did not support a finding that Mr. Yoder was gravely disabled in the manner described by the second alternative, provided by RCW 71.05.020(17)(b), even though that was the basis for the grave disability alleged in Mr. Trivelpiece's petition.

Instead, apparently looking at the standard form petition on which two boilerplate allegations were checked as applying, the trial court stated in its oral ruling:

> The second basis is, — the relevant one, the real relevant one here, that I see is a close call. Prior history or pattern of decompensation and discontinuation of treatment that results in continual repeated hospitalization. . . . Two hospitalizations is substantial restriction. And you do fine when you're on an LRA, Mr. Young, you get off the LRA, within a short time you wind back up in — in the hospital.
> It's a close case here as I see it. But there is a prior history, there is a pattern of decompensation, of doing things like losing insurance, losing the ability to get the medication that you need, and a loss of ability to perhaps recognize you need to continue taking your medication, and taking it.

RP at 41-42.

A problem with this explanation for the court's ruling is that the second allegation checked on the standard petition to which the court was referring is not, standing alone, a basis for commitment. The second allegation checked on the petition states:

> Respondent has a prior history or pattern of decompensation and discontinuation of treatment resulting in: 1) repeated hospitalizations, or 2) repeated peace officer interventions resulting in juvenile offenses, criminal charges, diversion programs or jail admissions.

6

CP at 2. Clearly, this allegation is derived from RCW 71.05.285, which provides that a prior history of decomposition and discontinuation of treatment resulting in repeated hospitalizations (or the other consequences identified) is <u>evidence</u>, which "may be used to provide a factual basis for concluding that the individual would not receive, if released, such care as is essential for his or her health or safety." But while the history is evidence (and is even to be given "great weight;" *see id.*), the grave disability that the State was required to prove under RCW 71.05.020(17)(a) was not the history, but that Mr. Yoder "[*i*]s *in danger of serious physical harm* resulting from a failure to provide for his or her essential human needs of health or safety." (Emphasis added.) It is that danger of serious physical harm resulting from a failure to provide for essential human needs of health or safety that we must decide was or was not supported by clear, cogent and convincing evidence presented by the State.

## *Challenged findings*

We turn to the trial court's findings of fact challenged by Mr. Yoder: findings 1, 2, 3, 5, 6, and 7. Our review of an involuntary commitment order "is limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law and judgment." *LaBelle*, 107 Wn.2d at 209.

> *Finding 1. There is recent, tangible evidence of a failure or inability to provide for essential human needs such as food, shelter, clothing, and medical treatment, which presents a high probability of serious physical harm in the near future unless adequate treatment is afforded.[3]*

The record contains no evidence to support the first challenged finding—in fact, in its oral ruling, the court observed, "I haven't heard anything—about anything occurring at any time as to not being able to take care of himself, or posing a danger to others." RP at 39. If anything, evidence suggested that Mr. Yoder was able to care for himself. The State's witnesses testified that when picked up by authorities, Mr. Yoder did not appear underfed or emaciated. They acknowledged he was receiving disability or other government benefits, and did not challenge Mr. Yoder's lawyer's suggestion that he was receiving over $3,000 a month. There was no evidence he was homeless. With no evidence to rely on, the trial court erred when it found that Mr. Yoder failed to, or was unable to, provide for his essential human needs such as food, shelter, or clothing. This portion of finding 1 must be stricken.

There was testimony that Mr. Yoder had a history of failing to take steps to maintain his medical insurance when he was released from an LRA, and as a

---

[3] Case law holds that in order to support a determination that an individual is gravely disabled under alternative (a), the State "must present *recent, tangible evidence*" of failure or inability to provide for the essential human needs "which presents a high probability of serious physical harm within the near future unless adequate treatment is afforded." *LaBelle*, 107 Wn.2d at 204-05 (emphasis added).

consequence, failed to obtain and take medication. While this testimony provided a recent tangible example, it did not support the associated finding of a "high probability of serious physical harm in the near future." Even when he was not taking medication, Mr. Yoder evidently did not suffer serious physical harm: he was able to care and provide for himself, and there was "[n]o known history of assaultiveness." CP at 6. He had no history of being picked up by authorities because he had harmed himself or anyone else.

The most serious harm identified in the record as having befallen this 67-year-old man was that one of his detentions was triggered when he was found walking along the side of the road in a snowstorm wearing sandals. As observed in *LaBelle*, in applying the gravely disabled standard of RCW 71.05.020(17), we must avoid "imposing majoritarian values on a person's chosen lifestyle which, although not sufficiently harmful to justify commitment, may be perceived by most of society as eccentric, substandard, or otherwise offensive." 107 Wn.2d at 204. Wearing sandals in the winter is not sufficiently harmful to justify commitment.

> *Finding 2. The failure or inability to provide for essential human needs arose as a result of a mental disorder.*
>
> *Finding 5. The Respondent is in danger of serious physical harm resulting from his failure to, or inability to provide for his essential health and safety needs.*

Because finding 1 is not supported by substantial evidence, findings 2 and 5, which are derivative, similarly lack support. While there is substantial evidence to

support finding 2's assertion that Mr. Yoder has a mental disorder, the remainder of the finding—that he was unable to provide for essential human needs—is not supported by the evidence. Nor is finding 5's assertion that Mr. Yoder is in danger of serious physical harm resulting from his failure or inability to provide for his essential health and safety needs.

> *Finding 6. Two examining physicians, or an examining physician and mental health professionals have analyzed the Respondent's condition and were willing to testify that the Respondent has a mental disorder that results in a likelihood of serious harm or that the Respondent is gravely disabled.*
>
> *Finding 7. The Respondent has been advised of the need for, but has not accepted, voluntary treatment.*

Finding 6 is not supported by the evidence. The only two witnesses who testified at the trial were both mental health professionals; no physician testified. While finding 7 seems likely given the contested nature of the hearing, the State offered no evidence that Mr. Yoder was advised of the need for, and had declined, voluntary treatment.

> *Finding 3. The Respondent evidences a prior history or pattern of decompensation and discontinuation of treatment resulting in repeated hospitalizations.*

There was testimony that Mr. Yoder had been hospitalized twice in the preceding three-year period and as earlier noted, the trial court found in its oral ruling that a pattern of decompensating following release had been demonstrated. This finding is supported by substantial evidence. The State points out that the historical pattern is, by statute,

10

No. 33439-2-III
*In re Invol. Treatment of R.Y.*

entitled to great weight, but even the State does not contend that the historical pattern alone establishes that Mr. Yoder was gravely disabled.

Where, as here, there is a total absence of evidence that Mr. Yoder was in danger of serious physical harm as a result of a failure or inability to provide for his essential human needs (and there is evidence to the contrary) the few findings by the trial court that are supported by the evidence do not support its legal conclusion that Mr. Yoder was gravely disabled. As a result, Mr. Yoder was denied his right to due process when the court entered an order extending his LRA for an additional 90 days.

The order of involuntary treatment is reversed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, J.

WE CONCUR:

Korsmo, J.

Fearing, C.J.

11