IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

COURT OF APPEALS DIV 1
STATE OF WASHINGTON
FILED
2018 NOV 26 AM 9: 55

In the Matter of the Detention of ) No. 76913-8-I
)
C.C., ) UNPUBLISHED OPINION
)
Respondent. ) FILED: November 26, 2018

SCHINDLER, J. — C.C. appeals the order of commitment for involuntary treatment. C.C. contends sufficient evidence does not support finding a likelihood of serious harm to others and that less restrictive alternative treatment was not in C.C.'s best interest. Because substantial evidence supports finding C.C. posed a substantial risk of harm to others as a result of her mental impairment and the court finding it was not in the best interest of C.C. to order less restrictive alternative treatment, we affirm the 14-day involuntary commitment order.

April 11, 2017 Petition for Involuntary Commitment

Thomas Conway and C.C. married in 1999 and lived on Mercer Island. C.C. is 26 years younger than Conway.

In December 2016, 93-year-old Conway lost consciousness as a result of "a combination of pneumonia, flu, and some heart arrhythmias." Conway was in the hospital for six days. After he returned home, Conway noticed "a change in [his] wife's

behavior." C.C. would often talk to Conway "[w]ell into the night" and on several occasions, pushed Conway "[f]airly forcefully."

On March 7, 2017, C.C. went to Storage Court. C.C. spoke to manager Richard Flynn about renting a storage space. C.C. appeared "a bit disheveled, but present mentally." However, "within minutes," C.C. became "[i]ntimidating. Controlling. Revealing things about herself that had nothing to do with renting a space." Flynn tried to end the conversation by extending his hand over the desk to signal it was "time to go." C.C. "came all the way around" Flynn's desk, grabbed his hand, and "started pulling . . . for all her worth . . . completely leaned back on both feet." When Flynn "pried" his hand loose, C.C. walked away "leering at [him] – smiling." C.C. told Flynn, "I'm going home to kill my husband."

On April 3, C.C. called Flynn about renting storage space. Flynn told C.C he would not rent to her. C.C. came to the storage facility. C.C. told Flynn he would " 'be hearing from [her] attorney.' " As she was walking out, C.C. said, " 'My doctors have told me I'm dying.' " When Flynn said he was " 'very sorry to hear that,' " C.C. said, " 'I'm not' " and left. Flynn contacted the police and filed a police report. The police report states, in pertinent part:

> Flynn said that he encountered [C.C.] on 03/[0]7/2017 when she came into
> the Storage Court office inquiring about a rental space. She verbalized
> how she needed it for after she divorced her invalid, 92 year old husband,
> whom she hated. Within minutes of the conversation she became
> increasingly harassing and demeaning towards him (Flynn). Her language
> became vulgar as she called herself a bitch and began performing deep-
> knee bends at the counter. Her strange and intimidating behavior
> continued to the point he just wanted her to leave. She stated that she
> was going to go home and kill her husband and that she only washed half
> her car to mentally torture her husband. She then made a veiled threat
> that if he repeated any of this to anyone. . . making a gesture of crushing a
> bug. She also suggested she would damage his car.

2

About two weeks ago he advised her that he would not be renting to her. On 04/03/17 at 1804 hours, she entered his office and asked if the business was a franchise. He advised her it wasn't. She then said he would be hearing from her attorney. He asked her to leave and as she exited she stated, "Oh by the way, I'm dying." He replied that he was sorry to hear that. She replied, I'm not.

On April 6, Conway gave a King County designated mental health professional the following written statement:

I am 93 years old and have a stent in my heart and a pacemaker. I am a fall risk. I have been married to [C.C.] since 1999. I am aware that my wife has a history of depression and is prescribed lamotrigine. I don't know if she has been taking her medications. I don't know whether she has been hospitalized for mental health. My wife has been decompensating for a while. I have become more comfortable when she is not home, because she can be angry and frustrated. She will get in my face and use profanity. She pushes me in the chest and did so a day ago. I fear for my safety when she does this because I am a fall risk. If I had to describe the way my wife she [sic] been acting, I would say manic, but she gets angry if someone brings up her behaviour [sic]. I believe that my wife is in need of mental health treatment.

Conway's son Peter Conway also gave a statement to a designated mental health professional on April 6. Peter Conway states he has observed C.C.'s "angry and hostile" behavior and he is "very concerned about my father's health and safety."

King County designated mental health professional Nicole Davis interviewed Conway and C.C. on April 10. On April 11, Davis filed a "Petition for Initial Detention" in King County Superior Court. The petition describes the police report Flynn filed and the interview with Conway. Davis states Conway told her the following:

Conway, in his statement and a face to face interview today, expressed fears that [C.C.] will harm him. At times he has left his long term home out of fear of her but has returned as of today because his children are out of town so he cannot stay with them currently. Daily, [C.C.] will get in his face and yell about things that aren't relevant, such as their children, finances, the past and grandiose topics. In the past few weeks she has struck him in the face and pushes him almost daily. He reports she will get into his face and flick his nose or poke him, anticipating he will respond in some way.

3

He tells us [C.C.] has had episodes like this before, where she has an elevated, irritable mood but given his increasing vulnerability due to age, he is fearful she will significantly harm him at this time. [Conway] believes psychiatric medications have helped her manage her moods in the past. He says she is up all night long talking and ranting to herself. She is constantly moving items around the home, in the yard and in her car.

The petition describes the "many concerns" Peter Conway has for the "safety of his elderly father."

Peter Conway is [C.C.'s] step son and has many concerns for the safety of his elderly father given [C.C.'s] recent yelling, provoking actions and hostility. She will get into his face yelling obscenities. He describes this as a sudden change around the New Year. The house [C.C.] and her husband share have many items strewn around with rotting food.

The petition also describes the interview with C.C. on April 10.

Today, we interviewed [C.C.]. She presented in a pressured manner with flight of ideas and grandiosity. She didn't have insight into her threats or need for immediate mental health treatment. She tells us she has not been sleeping well and has recently lost a significant amount of weight. At times [C.C.] is smiling and laughing and then will quickly change to a serious and somewhat hostile tone. Throughout the interview she speaks in a pressured manner and would have intense eye contact.

Mental health professional Davis asserts C.C. "suffers from a mental disorder characterized by elevated mood, irritability, paranoia, decreased sleeping, decreased appetite and decreased impulse control." Davis states C.C.'s "family report ongoing concerns about a recent change in her behaviors and mental stability" and she "is a danger to others and gravely disabled by escalating loss of cognitive and volitional control. She requires inpatient psychiatric care for her safety and . . . others."

The court entered an order for a nonemergency 72-hour initial detention of C.C. for "evaluation and treatment." The order was never served on C.C.

On May 3, Mercer Island police responded to a call about C.C. engaging in "erratic behavior while loading and unloading items in her car." Because there was an

4

outstanding "non-emergent court order for detention," the police took C.C. to Overlake hospital. C.C. told Overlake clinical psychologist Dr. Richard Thomas that she had been diagnosed with bipolar disorder as well as "severe depression." During the interview, C.C. was "extremely manic," making it difficult to ask her "any questions." Dr. Thomas reviewed C.C.'s extensive medical records and spoke to treatment providers.

May 5, 2017 Petition for Involuntary Treatment

On May 5, 2017, the State filed a "Petition for 14 Day Involuntary Treatment." The petition alleged 67-year-old C.C. "manifests a mental disorder characterized by rapid, manic thought patterns and speech, homicidal, threatening, and aggressive behavior, impaired judgment, insight, and impulse control." The petition states, "[A]ccording to the initial Petition for detention, her family reports a severe deterioration in her functioning - erratic behavior, labile mood, poor sleep and appetite, and homicidal/threatening/aggressive behavior towards her husband." The petition asserts C.C. "is suffering from a mental disorder . . . which has substantial adverse effects on [her] cognitive or volitional functions," she "presents . . . a likelihood of serious harm to others," and there are "no less restrictive alternatives to detention in the best interest of [C.C.] or others because . . . she requires the safety and structure of an inpatient setting." C.C. was admitted to Fairfax Behavioral Health hospital on May 6.

Probable Cause Hearing

The court held a two-day probable cause hearing on May 8 and 9. Storage Court manager Flynn, Conway, Fairfax involuntary treatment manager Dr. Cynthia Mason, C.C.'s daughter Denise Gorrell, C.C.'s friend Sheila Hartnell, and Overlake clinical psychologist Dr. Thomas testified.

5

Flynn testified the first time he met C.C. on March 7, she "started out very cordial," but then her demeanor "[s]tarted changing fairly fast." Flynn said, "[I]t was a little scary. . . . I felt like I was in the presence of somebody that had changed right before my eyes that looked like an older, fairly frail woman that came into my office. But very soon, I began to get the sense of — was not frail at all." Flynn testified that when C.C. grabbed his hand, he thought she "was going to pull me out of my chair" and "if our grip broke she was going to go right through the plaster of the wall." Flynn said C.C. "was incredibly strong. Surprisingly so." Flynn said C.C. came to the store "a total of four times" and he was "absolutely" concerned for his "own physical safety."

Ninety-four-year-old Conway testified that after he came home from the hospital in December 2016, C.C.'s behavior changed. C.C. "was increasingly very upset about my relationship with my children," she accused Conway of having "emotional dementia," and said he had "not paid attention to her needs." Conway testified that "a few times, she struck me sort of lightly and clearly accidentally, although she meant to be close, obviously, and pushed rather severely sometimes." Conway admitted C.C. pushed him "[f]airly forcefully" about "10 to 15 times" in the past five months. Conway said he "[n]ever fell" but "[s]ometimes stumbled slightly or . . . looked for support." Conway said his "greatest fear was falling" because falling could be "a death sentence" at his age.

C.C. had not lived at home for four to six weeks. Conway testified C.C. was very "angry" and he continued to have "concerns about [his] physical safety." But he and C.C. had not "made any definitive plans to divorce or break-up."

Fairfax involuntary treatment manager Dr. Mason testified that C.C.'s diagnosis on May 6 was "bipolar affective disorder manic with psychosis and alcohol abuse." Dr.

6

Mason described C.C.'s "thought process" as "grandiose and tangential, her mood as guarded, her affect as expansive — her behavior as hyper-verbal and in denial." Dr. Mason testified that on May 7, C.C.'s "insight appeared to be worsening . . . and her judgment remains impaired. Her thought process contains delusions, and . . . she continues to meet criteria for involuntary treatment."

C.C.'s daughter Gorrell testified that C.C. and Conway have a "pretty happy marriage." Gorrell said that "when they first got together they had a much more active marriage," but over time, C.C. "primarily has been his caregiver." Gorrell testified, "I've not seen my mother be violent towards [Conway]."

C.C.'s friend Hartnell testified she has known C.C. "for 40 years." Hartnell said C.C. "would be able to live with [her]" and she did not "have any concerns for [her] personal safety." However, Hartnell conceded she has never cared "for somebody who's going through a mental health crisis."

Overlake clinical psychologist Dr. Thomas was present throughout the probable cause hearing and was the last witness to testify. Dr. Thomas diagnosed C.C. with a "mental disorder" and a "current diagnosis" of "Bipolar Disorder Type 1." Dr. Thomas testified the "working diagnosis offered by Dr. Mason by the Fairfax records" is "consistent with the Overlake diagnosis." Dr. Thomas said Bipolar Disorder Type 1 mental disorder has a "substantial adverse effect on [C.C.]'s cognitive and relational functions." Dr. Thomas testified that "as a result of her mental disorder," C.C. "currently presents a substantial risk of physical harm to others."

Dr. Thomas testified C.C. has "continuing mania" that affects her "impulse control." Dr. Thomas said the "lack of impulse control" factors into the "risk of harm"

7

assessment. Dr. Thomas testified C.C. has "some insight" and "admits that she has bipolar disorder," but C.C. does not show "insight into the current level of mania."

Dr. Thomas recommended two weeks of inpatient treatment "to help treat the Bipolar Disorder and the mania." Dr. Thomas did not recommend less restrictive treatment because there are "two witnesses that are both afraid for their safety, and a patient who . . . ha[s] no insight into how her behavior is causing these people to fear for their safety." Dr. Thomas testified less restrictive alternative treatment would not "be appropriate at this time . . . because of the ongoing mania." Dr. Thomas opposed discharging C.C. to live with her friend Hartnell.

> [I]f [C.C.] wasn't showing active symptoms of mania, this would appear to be an appropriate discharge plan. However, I'm being asked to assess if I believe she poses a danger to others, and I do. And so, the fact that Ms. Hartnell wants to have [C.C.] at her home doesn't tell me that . . . [C.C.] is not going to present potential danger to others.

On cross-examination, Dr. Thomas testified that C.C. "hasn't been assaultive" since she began regularly taking medication while hospitalized at Fairfax and "hasn't been threatening people."

On redirect, Dr. Thomas said the "entire purpose" of inpatient treatment is to "help ameliorate" her "poor impulse control." Dr. Thomas testified, "If [C.C.] was not showing continued symptoms of mania, I would not be as concerned as I am now." However, because "she is still displaying these symptoms while in the hospital," Dr. Thomas did not "believe that [C.C.] is stable enough to be discharged in the community and . . . attend to her own psychiatric needs."

The State argued the preponderance of the evidence showed "it is more likely than not that due to a mental disorder, [C.C.] currently presents a substantial risk of

physical harm to others." The State opposed less restrictive treatment. The State asserted Hartnell's testimony that "she didn't think that [C.C.] was capable of engaging in acts of physical aggression" and that "she's never cared for an individual in a mental health crisis" called into question "how willing and prepared [Hartnell] is to undertake that responsibility based on what we know about the severity of [C.C.]'s symptoms."

C.C.'s attorney argued that "[a]ll this behavior in early March" happened "four to six weeks ago" and C.C. planned to live "somewhere else." C.C.'s attorney conceded C.C. has "been exhibiting the manic symptoms in the hospitals" but argued that because she "still had impulse control," further hospitalization is not "justified based on her behavior of showing manic symptoms."

Order for 14-day Involuntary Treatment

The court entered an order for a 14-day involuntary treatment. The court found that C.C. suffers "from a mental disorder" that "is currently having a substantial adverse effect on her cognitive and volitional functioning." The court found that "as a result of that disorder," C.C. presents "a substantial risk of serious harm to others as evidenced by behavior which has placed others in reasonable fear of sustaining such harm." The court found C.C. is "still highly manic" and "does not seem to be displaying any significant insight at this time." The court ruled, "[I]n light of the preponderance standard the Court finds there is sufficient evidence to enter an order of in-patient hospitalization." The court "considered an LRO[1] as a suitable alternative to inpatient hospitalization" but found "no treatment provider is currently willing to monitor such an order pursuant to

---

[1] Less restrictive order.

9

RCW 71.05.585(3)."[2] The court entered findings of fact, conclusions of law, and order committing C.C. for involuntary treatment for 14 days.

After C.C. filed a notice of appeal of the order of commitment on May 25, the court entered supplemental findings of fact and conclusions of law.

14-Day Involuntary Commitment Order is Not Moot

The State notes the 14-day commitment order entered on May 9, 2017 expired on May 23. However, the State concedes the appeal is not moot because an involuntary commitment order may have adverse consequences for future commitment proceedings. We accept the concession as well taken.

> In the case of civil commitments under chapter 71.05 RCW, the trial court is directed to consider, in part, a history of recent prior civil commitments; thus each order of commitment entered up to three years before the current commitment hearing becomes a part of the evidence against a person seeking denial of a petition for commitment.

In re Det. of M.K., 168 Wn. App. 621, 626, 279 P.3d 897 (2012)[3] (citing RCW 71.05.012, .212, .245).

Likelihood of Serious Harm

C.C. contends sufficient evidence does not support finding C.C. presented a likelihood of serious harm to others. We review the trial court's decision to determine whether substantial evidence supports the findings of fact and whether those findings in turn support the court's conclusions of law. In re Det. of LaBelle, 107 Wn.2d 196, 209,

---

[2] RCW 71.05.585 sets the minimum requirements for less restrictive treatment and requires treatment be "administered by a provider that is certified or licensed." RCW 71.05.585(3). We note the legislature amended RCW 71.05.585 in 2018. LAWS OF 2018, ch. 291, § 2. As amended, "medication management" is no longer a less restrictive treatment requirement but "may" include "medication management." RCW 71.05.585(2). The 2018 amendment did not change subsections (3), (4), or (5). RCW 71.05.585(3) states, "Less restrictive alternative treatment must be administered by a provider that is certified or licensed to provide or coordinate the full scope of services required under the less restrictive alternative order and that has agreed to assume this responsibility."

[3] Footnote omitted.

728 P.2d 138 (1986). Substantial evidence is the quantum of evidence sufficient to persuade a rational fair-minded person the premise is true. In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015).

Under RCW 71.05.230,[4] "[a] person detained for seventy-two hour evaluation and treatment may be committed for not more than fourteen additional days of involuntary intensive treatment." A person may be involuntarily committed for treatment of a mental disorder if the person poses "a substantial risk of harm to themselves, others, or the property of others." LaBelle, 107 Wn.2d at 201-02; RCW 71.05.230(4)(b). The State must prove by a preponderance of the evidence the respondent has a mental disorder that presents a likelihood of serious harm to others and that there is no less restrictive alternative to detention in the best interest of such person or others. RCW 71.05.240(3)(a). RCW 71.05.020(35)(a)(ii)[5] defines "likelihood of serious harm" as a "substantial risk that . . . [p]hysical harm will be inflicted by a person upon another, as evidenced by behavior which has caused such harm or which places another person or persons in reasonable fear of sustaining such harm."

C.C. cites In re Detention of D.V., 200 Wn. App. 904, 403 P.3d 941 (2017), to argue the evidence does not show likelihood of serious harm because she did not pose a risk of harm to Flynn and she was not currently living with Conway. In D.V., the individuals who were threatened did not testify. D.V., 200 Wn. App. at 908. We held that in the absence of evidence that the individual to whom the behavior is directed is

---

[4] The legislature amended RCW 71.05.230 in 2017 and 2018. LAWS OF 2017 3d Spec. Sess., ch. 14, § 17; LAWS OF 2018, ch. 291, § 6. Because the amendments do not change to language pertinent to our analysis, we cite the current statute.

[5] The legislature amended RCW 71.05.020 several times in 2017 and 2018. LAWS OF 2017 3d Spec. Sess., ch. 14, § 14; LAWS OF 2018, ch. 201, § 3001; LAWS OF 2018, ch. 291, § 1; LAWS OF 2018, ch. 305, § 1. Because the definition of "likelihood of serious harm" has not changed, we cite the current statute.

"personally in fear that he or she would be harmed in the manner threatened," the State did not establish the "likelihood of serious harm" to others. D.V., 200 Wn. App. at 907-08.

Unlike in D.V., Flynn and Conway testified at the probable cause hearing. Both Flynn and Conway testified they were in fear of physical harm from C.C. The court expressly found the testimony of Flynn and Conway credible and "incorporate[d] [their] testimony by reference." We defer to the trier of fact as to the credibility of witnesses. In re Vulnerable Adult Petition of Knight, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014).

The court concluded C.C. "poses a substantial risk of physical harm to others as a result of her mental impairment" and her "continued manifestation of symptoms of mania once hospitalized." The court concluded C.C. "poses a substantial risk of physical harm to others" based on the following findings as to Flynn:

> [C.C.]'s attempt to pull Richard Flynn out of his chair during a parting exchange at his workplace in March 2017 [and] the testimony of Richard Flynn that he felt concerned about his physical safety as a result of [C.C.]'s conduct.

The court concluded C.C. "poses a substantial risk of physical harm" to Conway based on the following findings:

> Acts of physical aggression (e.g. forceful shoving) toward her elderly husband, Tom Conway, multiple times since December 2016; . . . the testimony of Tom Conway that he felt concerned about his physical safety as a result of [C.C.]'s conduct; [and] [C.C.]'s remark in March 2017 that she intended to kill her husband.

Substantial evidence supports finding C.C. placed both Conway and Flynn in reasonable fear for their safety and presents the likelihood of serious harm.

C.C. also contends substantial evidence does not support finding current dangerousness because there was no evidence of a recent overt act demonstrating

substantial risk of harm to others. RCW 71.05.020(35) requires "a showing of a substantial risk of physical harm as evidenced by a recent overt act. This act may be one which has caused harm or creates a reasonable apprehension of dangerousness." In re Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982). While the overt act must be recent, "imminent" danger is not required as a condition of involuntary detainment. Harris, 98 Wn.2d at 282. RCW 71.05.245(3) defines "recent" as "the period of time not exceeding three years prior to the current hearing."

C.C. argues the physical contact she had with Conway and Flynn four to six weeks before the hearing does not prove "current dangerousness." C.C. concedes her "interactions" with Flynn and Conway are "recent within the meaning of RCW 71.05.245" but argues the evidence does not demonstrate she was "currently dangerous as required by due process."

Substantial evidence supports a finding that C.C. demonstrates current dangerousness. Dr. Thomas testified C.C. demonstrates "continuing mania" that impacts her "impulse control." Because of her "continued symptoms of mania," C.C. was "at risk for continuing all this behavior that was happening prior."

Less Restrictive Treatment

C.C. contends the court erred by not ordering less restrictive alternative treatment. Former RCW 71.05.240(3) (2016)[6] provides:

> At the conclusion of the probable cause hearing:
> (a) If the court finds by a preponderance of the evidence that such person, as the result of mental disorder, presents a likelihood of serious harm, or is gravely disabled, and, after considering less restrictive alternatives to involuntary detention and treatment, finds that no such alternatives are in the best interests of such person or others, the court

---

[6] The 2017 version of RCW 71.05.240 was in effect from June 9, 2016 until April 1, 2018 and amended in 2018. LAWS OF 2016, ch. 45, § 2; LAWS OF 2018, ch. 291, §§ 7, 18.

shall order that such person be detained for involuntary treatment not to exceed fourteen days in a facility certified to provide treatment by the department. If the court finds that such person, as the result of a mental disorder, presents a likelihood of serious harm, or is gravely disabled, but that treatment in a less restrictive setting than detention is in the best interest of such person or others, the court shall order an appropriate less restrictive alternative course of treatment for not to exceed ninety days;

. . . .

(c) An order for less restrictive alternative treatment must name the mental health service provider responsible for identifying the services the person will receive in accordance with RCW 71.05.585, and must include a requirement that the person cooperate with the services planned by the mental health service provider.[7]

In In re Detention of J.S., 124 Wn.2d 689, 697-98, 880 P.2d 976 (1994), the Washington Supreme Court held that a trial court has the discretion to order less restrictive treatment even if treatment is not available or no facility has agreed to assume the responsibility.

> The Legislature has emphasized the importance of less restrictive treatment and has, in fact, directed the court to consider less restrictive treatment at each stage of involuntary commitment proceedings. Restricting the court's ability to order less restrictive treatment would not be consistent with this clear legislative intent.

J.S., 124 Wn.2d at 698. But the court held a respondent does not have a "statutorily guaranteed right under RCW 71.05 to less restrictive treatment." J.S., 124 Wn.2d at 701. The trial court may " 'take into account the availability of treatment options or . . . the resources necessary to supply some of these options.' " J.S., 124 Wn.2d at 700-01 (quoting Jackson v. Fort Stanton Hosp. & Training Sch., 964 F.2d 980, 992 (10th Cir. 1992)).

C.C. contends that because the court initially found less restrictive treatment was in her best interest, the court erred by not ordering less restrictive treatment under RCW 71.05.240(3). Following testimony at the probable cause hearing, the court said it was

---

[7] Emphasis added.

14

"inclined to order [less restrictive treatment] in this case." The court granted a recess to allow the parties to contact a "community provider and see if [less restrictive treatment] can happen." No health care provider was willing to monitor less restrictive treatment for C.C.

When the hearing resumed, the court found C.C. is "still highly manic," "has continued to present as manic at the hospital," and "there is a significant risk that the behaviors in the community would continue." The court ruled, "[T]here is sufficient evidence to enter an order of in-patient hospitalization."

> Based upon all of the evidence and considering the argument of Counsel and applying a preponderance standard, . . . [C.C.] does suffer from a mental disorder, which is currently having a substantial adverse effect on her cognitive and volitional functioning. . . . [A]s a result of that disorder, she does present as a substantial risk of serious harm to others as evidenced by behavior which has placed others in reasonable fear of sustaining such harm.

The record establishes the court expressly found less restrictive treatment was not in the best interest of C.C. The record shows that after considering the lack of treatment options and resources available, the trial court expressly ruled less restrictive treatment and discharge was not in the best interest of C.C. J.S., 124 Wn.2d at 700-01. The court concluded absent a health care provider willing to monitor less restrictive treatment, discharge was not in the best interest of C.C.

> I then have to consider a less-restrictive order, which I think would be under the right circumstances with the right housing and treatment a very appropriate . . . alternative in this case. . . . [T]he Court at this time does not have any information that there is a care provider willing . . . and able to supervise a less-restrictive order, and I am, therefore, not able to find that one is available. And for that reason, it would not be in [C.C.]'s best interest to release her.[8]

---

[8] We may "consider a trial court's oral decision so long as it is not inconsistent with the trial court's written findings and conclusions." State v. Kull, 155 Wn.2d 80, 88, 118 P.3d 307 (2005).

The court noted the decision was without prejudice to "the entry of an LR[O] as soon as that becomes an appropriate next step on the case." The written findings state, "In the absence of an express assumption of responsibility on the part of a mental health treatment provider pursuant to RCW 71.05.585(3), the court is unable to order less restrictive alternative treatment for the Respondent (even should such treatment be in the best interest of the Respondent or others)."

We affirm the 14-day involuntary commitment order.

WE CONCUR: