# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Detention of<br><br>K.C.,<br><br><div align="center">Appellant.</div> | No. 54600-1-II<br><br><br><br><br>UNPUBLISHED OPINION |

CRUSER, J. — KC appeals a superior court order denying his motion to revise the commissioner's ruling imposing 90 days of involuntary treatment for his mental health condition following dismissal of his nonviolent felony charges. KC argues that the trial court's factual findings were not supported by substantial evidence and that therefore, its conclusion that he was gravely disabled was not supported by the findings.

We hold that although the State did not provide clear, cogent, and convincing evidence that that KC was gravely disabled under subsection (a) of former RCW 71.05.020(22) (2019), it did set forth substantial evidence sufficient to support the trial court's finding that KC was gravely disabled as defined in subsection (b) in former RCW 71.05.020(22). Therefore, we hold that the trial court's conclusion that KC was gravely disabled was supported by its findings, and the 90-day involuntary commitment order was properly entered.

Accordingly, we affirm in part and reverse in part and remand for the superior court to strike the gravely disabled finding under former RCW 71.05.020(22)(a).

FACTS

KC is an individual who has had an extensive history of severe mental health issues that resulted in several admissions to Western State Hospital and multiple contacts with other mental health services. In October 2019, KC was arrested and charged with a second degree burglary and unlawful use of drug paraphernalia following an incident at a pharmacy. During the incident, KC exhibited behaviors that employees of the pharmacy described as erratic and that made them afraid to approach him. A trial court found that KC was not competent to stand trial and dismissed the charges. The trial court ordered KC to undergo evaluation for civil commitment.

During the intake process, when KC was admitted to Western State Hospital following dismissal of the felony charges, KC initially denied that he had a history of issues with mental health. He also denied that he had a present mental health condition. Eventually, however, KC stated that he had been admitted for treatment on one prior occasion. A physician on KC's treatment team noted that KC's disposition on intake indicated mood lability, rigid and tangential thinking, with some delusional ideations.

KC stated that he lived in Spanaway before his arrest, but he did not provide any additional details regarding his prior living circumstances. In response to questions regarding his plans on discharge, KC claimed that he owned multiple homes in Spanaway, but he could not provide any addresses for these residences.

When asked about his financial circumstances, KC told the psychiatric social worker who conducted his intake that he was a part owner of a popular fast food chain. He also explained that he received disability income through social security, but when he was asked what disability the benefits were based on, KC responded that he did not have a disability. KC also explained that he

had a payee who managed his disability benefits, but he provided two alternate names and could not or would not provide contact information for either individual.

Petitioners Benjamin LaLiberte, Ph.D., and Daniel Ruiz-Paredes, M.D., filed a petition for involuntary treatment. The petitioners initially recommended that KC should be involuntarily committed to 180 days of treatment because he presented a substantial likelihood of repeating similar acts to the charged felony offense and because he was gravely disabled. At the hearing on the petition, however, the petitioners recommended 90 days of involuntary treatment based on grave disability alone.

The petition detailed KC's prior competency evaluations dating back to 2007 and outlined other significant events in KC's mental health history. The petition also described the incident that led to KC's felony charge as well as KC's interactions with members of his treatment team since admission. The information contained in the petition is consistent with the facts stated above.

Dr. LaLiberte testified on behalf of the petitioners at KC's commitment hearing. He described the sole interview he had with KC prior to the filing the petition and noted that the interview was brief because KC exercised his right to terminate the conversation. In addition to his brief interaction with KC, Dr. LaLiberte explained that his opinions were also based on Western State Hospital records from KC's prior admissions, prior competency evaluations, the police report from the index felony, treatments notes, and conversations with members of KC's treatment team. Following his review of KC's records and other information, Dr. LaLiberte diagnosed KC with "schizophrenia by history; a history of alcohol, marijuana, and methamphetamine use; as well as a provisional diagnosis of intellectual disability." Sealed Verbatim Report of Proceedings (VRP) (Nov. 15, 2019) at 6-7.

During Dr. LaLiberte's brief interaction with KC, he observed that KC's speech was difficult to understand and indicated some cognitive dysfunction. Dr. LaLiberte asked KC about KC's discharge plans and KC responded by saying only that he would return to Spanaway and concluded the interview at that point. During the interview, KC appeared to have adequate grooming and hygiene. KC was also alert and polite throughout his contact with Dr. LaLiberte.

Dr. LaLiberte believed that while some of KC's symptoms, such as KC's delusional statements, lessened since KC's admission, other symptoms remained. Dr. LaLiberte noted further that KC lacked insight into his mental condition. Based on the foregoing, Dr. LaLiberte opined that KC was gravely disabled and that KC's continued symptoms and lack of insight into his condition would prevent KC from meeting his essential health and safety needs. Without the highly structured setting of a treatment facility like Western State Hospital, Dr. LaLiberte testified that KC's mental health condition would deteriorate.

The commissioner found that KC was gravely disabled under both alternative definitions of gravely disabled in former RCW 71.05.020(22) and ordered 90 days of involuntary treatment. KC moved for revision before the superior court, arguing that the State did not satisfy its burden of showing that he was gravely disabled. KC also argued that the commissioner erred in admitting Dr. LaLiberte's testimony under ER 703 because the testimony improperly interposed inadmissible hearsay into the record. The superior court denied KC's motion to revise the commissioner's ruling. KC appeals the order denying his motion to revise the commissioner's ruling.

## DISCUSSION

### I. STANDARD OF REVIEW

On a motion to revise a commissioner's ruling, "the superior court reviews both the commissioner's findings of fact and conclusions of law de novo based upon the evidence and issues presented to the commissioner." *State v. Ramer*, 151 Wn.2d 106, 113, 86 P.3d 132 (2004). Where the superior court denies the motion to revise the commissioner's ruling, it adopts the commissioner's findings of facts and conclusions of law. *Tedford v. Guy*, 13 Wn. App. 2d 1, 12, 462 P.3d 869 (2020). We then review the superior court's decision on revision, as opposed to the commissioner's decision. *Ramer*, 151 Wn.2d at 113.

We review the trial court's decision on involuntary commitment to determine whether the findings are supported by substantial evidence "and, if so, whether those findings support the conclusion of law and judgment." *In re Det. of T.C.*, 11 Wn. App. 2d 51, 56, 450 P.3d 1230 (2019). The State has the burden of proving that a person is gravely disabled by clear, cogent, and convincing evidence. *In re Det. of M.W.*, 185 Wn.2d 633, 656, 374 P.3d 1123 (2016). We do not review a trial court's decision regarding witness credibility. *In re Det. of H.N.*, 188 Wn. App. 744, 763, 355 P.3d 294 (2015).

### II. SUBSTANTIAL EVIDENCE OF GRAVE DISABILITY

Where a trial court has determined that a person is incompetent to stand trial for felony charges, the charges must be dismissed without prejudice and that person must undergo evaluation for civil commitment under chapter 71.05 RCW. Former RCW 10.77.086(4) (2019). The professional person in charge of a treatment facility may then petition for 90 days of involuntary treatment based on grave disability under RCW 71.05.280(4). Former RCW 71.05.290(3) (2017).

A person is "gravely disabled," as defined under former RCW 71.05.020(22) if, "as a result

of a mental disorder" that person:

> (a) Is in danger of serious physical harm resulting from a failure to provide for
> his or her essential human needs of health or safety; or (b) manifests severe
> deterioration in routine functioning evidenced by repeated and escalating loss
> of cognitive or volitional control over his or her actions and is not receiving
> such care as is essential for his or her health or safety.

Either of the two alternative definitions of "'gravely disabled'" set forth in former RCW

71.05.020(22) provide a basis for involuntary commitment. *In re Det. of LaBelle*, 107 Wn.2d 196,

202, 728 P.2d 138 (1986) (quoting former RCW 71.05.020(1) (1979)).

KC argues that the State failed to set forth clear, cogent, and convincing evidence sufficient

to support the trial court's findings that he is gravely disabled as defined under former RCW

71.05.020(22)(a) and .020(22)(b). We agree with KC that the trial court's finding that KC was

gravely disabled as defined under former RCW 71.05.020(22)(a) was not supported by substantial

evidence. However, clear, cogent, and convincing evidence supported the trial court's finding that

KC was gravely disabled under former RCW 71.05.020(22)(b).

A. GRAVELY DISABLED UNDER FORMER RCW 71.05.020(22)(A)

1. Legal Principles

To satisfy its evidentiary burden of demonstrating a grave disability under former RCW

71.05.020(22)(a),

> the State must present recent, tangible evidence of failure or inability to provide for
> such essential human needs as food, clothing, shelter, and medical treatment which
> presents a high probability of serious physical harm within the near future unless
> adequate treatment is afforded. Furthermore, the failure or inability to provide for
> these essential needs must be shown to arise as a result of mental disorder and not
> because of other factors.

*LaBelle*, 107 Wn.2d at 204-05 (discussing former RCW 71.05.020(1)(a)).

It is not enough that the State show a person faces uncertain living arrangements or lacks financial resources. *Id.* at 210. To justify involuntary commitment, the State must demonstrate that the person's mental health condition renders that person "unable to make a rational choice with respect to his [or her] ability to care for his [or her] essential needs." *Id.* Relevant considerations include whether an individual has an ability to "form realistic plans for taking care of himself [or herself] outside the hospital setting," and whether the individual has an "awareness of hygiene and routine care." *Id.*

2. Application

Although the State presented evidence showing that KC's living arrangements and financial circumstances upon release were uncertain, the State did not set forth clear, cogent, and convincing evidence that such uncertain circumstances would lead to a high probability of serious physical harm to KC. In *Labelle*, the supreme court cautioned against erroneous commitment of individuals whose chosen lifestyles do not necessarily fit within "majoritarian values." *Id.* at 204. Rather, the potential for physical harm from an inability to meet basic needs must be sufficiently severe to justify the "'massive curtailment of liberty,'" that follows involuntary commitment. *Id.* (internal quotation marks omitted) (quoting *In re Det. of Harris*, 98 Wn.2d 276, 283, 654 P.2d 109 (1982)).

KC did not describe a concrete plan for release when speaking with Dr. LaLiberte, and he stated vaguely that he would "just go back to Spanaway," VRP (Nov. 15, 2019) at 12. KC also made statements regarding several houses and a business that he owned, which Dr. Laliberte classified as "possibly grandiose," and "delusional." *Id.* at 14. But the State did not specify any

physical harm that would follow from KC's uncertain living circumstances, much less demonstrate a risk of serious physical harm.

Here, KC presented with adequate hygiene and grooming during his interview with Dr. LaLiberte. KC exhibited mumbled speech that was difficult to understand, but he was also alert and polite during the meeting. The petitioners' determination that KC would be unable meet his basic needs on release was largely due to KC's lack of an adequate discharge plan and several statements KC made on intake that indicated delusional thoughts regarding his living and financial circumstances. But the petitioners did not mention or otherwise reference any discrete physical harm that KC would face as a result of his inability to meet his essential human needs. In *Labelle*, the court cautioned that evidence of uncertainty in living or financial circumstances does not alone warrant involuntary treatment. 107 Wn.2d at 204. Therefore, the trial court's finding that KC was gravely disabled under former RCW 71.05.020(22)(a) was not supported by substantial evidence.

B. GRAVE DISABILITY UNDER FORMER RCW 71.05.020(22)(B)

1. Legal Principles

To find that an individual continues to be gravely disabled within the meaning of former RCW 71.05.020(22)(b), the evidence must show: (1) a severe deterioration in routine functioning and (2) failure to receive treatment that is essential for health or safety. *Id*.at 205 (discussing former RCW 71.05.020(1)(b)). To satisfy the first requirement, the State's evidence of a severe deterioration in routine functioning "must include recent proof of significant loss of cognitive or volitional control." *Id*.at 208.

To satisfy the second requirement in former RCW 71.05.020(22)(b), the State must present evidence that,

the individual is not receiving or would not receive, if released, such care as is essential for his or her health or safety. It is not enough to show that care and treatment of an individual's mental illness would be preferred or beneficial or even in his best interests. To justify commitment, such care must be shown to be essential to an individual's health or safety and the evidence should indicate the harmful consequences likely to follow if involuntary treatment is not ordered.

*Id*. (emphasis omitted). That is, the individual must be "*unable*, because of severe deterioration of mental functioning, to make a rational decision with respect to his need for treatment." *Id.* (emphasis in original). This requirement exists to establish the necessary causal nexus between "proof of 'severe deterioration in routine functioning' and proof that the person so affected 'is not receiving such care as is essential for his or her health or safety.'" *Id.*

Former RCW 71.05.020(22)(b) incorporates the definition of decompensation and thus "permits the State to treat involuntarily those discharged patients who, after a period of time in the community, drop out of therapy or stop taking their prescribed medication and exhibit "'rapid deterioration in their ability to function independently.'" *Id*.at 206 (quoting Mary L. Durham & John Q. LaFond, The Empirical Consequences and Policy Implications of Broadening the Statutory Criteria for Civil Commitment, 3 YALE L. & POL'Y REV. 395, 410 (1985)). This alternate definition of grave disability was added by the legislature to "broaden the scope of the involuntary commitment standards." *Id.* at 205-06.

2. Application

The State presented clear, cogent, and convincing evidence that satisfied both requirements in former RCW 71.05.020(22)(b) and thus supported the trial court's finding that KC was gravely disabled under that definition. With respect to the first requirement, the State set forth evidence that KC experienced a recent loss in cognitive and volitional control. After law enforcement issued a trespass notice to KC for his actions inside a pharmacy, he returned to the pharmacy several

hours later and engaged in behavior that staff described as "erratic." VRP (Nov. 15, 2019) at 15. When police arrived on the second occasion, they noted KC's hostile and agitated demeanor. KC was found incompetent to stand trial for the charges associated with this incident.

During KC's admission to Western State Hospital following dismissal of his felony charges, staff noted that KC exhibited mood lability, "tangential thought processes, perseveration, and delusional ideation." Sealed Clerk's Papers at 55. Although Dr. LaLiberte's interview with KC was brief, Dr. LaLiberte observed evidence of KC's cognitive dysfunction or schizophrenia in KC's speech, which was difficult to understand.

The State also presented clear, cogent, and convincing evidence that satisfied the second requirement in former RCW 71.05.020(22)(b). The petition for involuntary commitment described KC's extensive history of mental illness, including multiple competency evaluations and admissions to Western State Hospital. However, during KC's most recent intake interview at Western State, KC denied that he had a mental health disorder.

Dr. LaLiberte testified that because KC lacked insight into his mental health condition, "it would make it very difficult for [him] to independently keep up with his own health and welfare." VRP (Nov. 15, 2019) at 15. In particular, Dr. LaLiberte cautioned that if KC is transferred out of a structured setting before KC had the ability to understand "the severity and extent of his severe [sic] mental illness and some of his intellectual difficulties that he would, . . . not take medication and start engaging in the behavior that was documented in that police report, which was kind of odd, bizarre, not very goal directed." *Id.* at 16.

KC asserts that evidence that he displayed proper grooming and hygiene during his interview with Dr. LaLiberte and that some of KC's symptoms had remitted refutes the State's position that KC was gravely disabled under former RCW 71.05.020(22)(b). We disagree.

In *Labelle*, the Supreme Court held that the second definition of gravely disabled should not be interpreted to "exclude those persons whose condition has stabilized or improved, even if minimally (i.e., is not "escalating") by the time of the commitment hearing." 107 Wn.2d at 207. Therefore, remittance of some of KC's symptoms does not dispel the State's evidence regarding KC's continued lack of insight and the risk that KC would deteriorate if he were released prematurely. Taken together, the State's evidence supported the trial court's finding that KC's condition fell within the definition of grave disability under RCW 71.05.020(22)(b).

## CONCLUSION

We hold that although the trial court's finding that KC was gravely disabled under former RCW 71.05.020(22)(a) was not supported by substantial evidence, its finding that KC was gravely disabled under former RCW 71.05.020(22)(b) was supported by substantial evidence. Because the finding that KC was gravely disabled as defined in former RCW 71.05.020(22)(b) supports the commissioner's conclusion that KC was gravely disabled, we hold that the trial court properly denied KC's motion to revise the commissioner's ruling imposing 90 days of involuntary treatment.

Accordingly, we affirm in part and reverse in part and remand for the superior court to strike the gravely disabled finding under former RCW 71.05.020(22)(a).

No. 54600-1-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, P.J.

VELJACIC, J.