IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Detention of:<br><br>S.T.,<br><br>     Petitioner, | No. 86142-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — A trial court ordered S.T. involuntarily committed for treatment for a period of up to 14 days pursuant to the "Involuntary Treatment Act" (ITA), chapter 71.05 RCW. In issuing its order, the trial court found that S.T. presented a serious likelihood of harm to others and was gravely disabled. S.T. challenges his commitment, arguing there was not substantial evidence to support the court's findings that he posed a likelihood of serious harm and was gravely disabled. We disagree and affirm.

FACTS

S.T. is a 23-year-old male who has a history of hospitalizations for mental health events.[1] S.T.'s mother, Kristen Alexander, testified that in early December 2023, S.T. started to behave erratically. She described that they "had gone to a yoga class together and he, like, took off his shirt and was kind of in his

---

[1] For example, his mother, Kristen Alexander, testified that he was hospitalized in January 2022 at Fairfax Hospital in Everett, Washington, three months later at Swedish Hospital in Ballard, in November 2022 at Northpoint in Idaho for a cannabis addiction, and in late summer or fall 2022 after going missing in Bangkok, Thailand while studying abroad.

own . . . world." Then, as they were leaving the yoga class, he began to yell at another patron, accusing the patron of "hitting on" Alexander. She also testified that on their drive home, S.T. "rolled down a [car] window and he screamed at them (a family) to use the crosswalk."

Alexander further testified that S.T. was not sleeping, began "rearranging things, furniture . . . closing all the doors in [ ] our home. . . . [and he] suddenly decided that he was Muslim." She explained that leading up to December 10, S.T. made a sexually explicitly comment to his then-girlfriend in front of Alexander that scared both Alexander and his then-girlfriend.

Alexander testified that on December 10, she was explaining to S.T. that she was concerned about him and implored him to see a doctor and to take his medication. However, she testified that S.T. was aggressive with her and "headbutted me. . . . He had grabbed me by the arms very forcefully and . . . it felt like he was throwing me around like a rag doll, and it was frightening me. . . . I was just frightened for my wellbeing." She reported that his headbutt was hard enough that her head turned red and swollen, requiring her to ice it.

In response to Alexander's call, Kirkland Police Department transported S.T. to Evergreen Health in Kirkland, Washington, on an involuntary hold "due to violent behavior towards his mother."[2] At Evergreen Health, S.T. was described as presenting with "tangential speech" and became "agitated and required

---

[2] Brenda Miller-Sermeño, a designated crisis responder, filed a notice of emergency detention taking S.T. into custody with King County Superior Court as well as a petition for initial detention.

2

seclusion, then restraints, and eventually intramuscular Haldol." S.T. was also described as being "restless in [his] room with impulsive movements."

On December 12, S.T. was transported to Fairfax Behavioral Hospital (Fairfax Hospital) in Kirkland for continued treatment. Upon his admission, S.T. was described as "present[ing] with symptoms strongly suggestive of catatonia."[3] To address S.T.'s symptoms suggesting catatonia, he was administered Ativan, to which he reportedly responded well. Additional notes indicate that S.T.'s "[c]oncentration has been very poor, and he was needing redirection to pay attention," and that his psychomotor skills were "retarded with some waxy hand movements." An entry from December 18 indicates that S.T. was "agitated and challenge[d] and argue[d] with Staff" and slept for only four hours.

Anita Vallee, a court evaluator for Fairfax Hospital and licensed social worker, testified to S.T.'s hospital records. Vallee evaluated S.T and testified that in making her evaluation she "consider[s] conversations with the treatment team, the provider, observations of the patient . . . as well as testimony from the previous witnesses, records from the hospital that referred as well as records here at Fairfax." Vallee stated that when she interviewed S.T. on December 15, he expressed that he felt he no longer needed treatment. When she asked about his plans for discharge, "he said he would be returning to his family's home. And then I asked him about a psychiatrist for ongoing medication, and he had indicated he would be going to a primary care physician."

---

[3] Vallee described catatonia as "a psychotic symptomology that slowly starts shutting down the body to the point where they're not able to move, eat, drink, and could lead to ultimately death without medical intervention."

Fairfax filed a petition for 14-day involuntary treatment claiming that S.T presented a likelihood of serious harm to others and was gravely disabled. At the commitment hearing, S.T.'s mother testified to the events leading up to his emergency detention, and court evaluators from Fairfax Hospital and Evergreen Health testified as to the records from S.T.'s stays, which the court found credible.

At the hearing, Alexander testified that she would not feel safe if S.T. were released from the hospital without being stabilized on his medication. She further testified that prior to the hearing, she had talked with S.T., and he had been angry that she was going to testify against him and "said it was [her] fault that he was hospitalized."

Vallee testified that S.T. had a working diagnosis of "[b]ipolar disorder, most recent episode manic with psychotic features," which she based on his "increased paranoia, superficial, guarded, elevated and labile mood," as well as his "poor hygiene, poor sleep . . . as well as erratic and bizarre and aggressive behaviors." Vallee explained that bipolar disorder was a mental impairment that had an adverse effect on S.T.'s cognitive and volitional control. As such, Vallee concluded that S.T. presented a substantial risk of harm to others and was gravely disabled because he could not provide for his own health or safety and showed severe deterioration.

The trial court found by a preponderance of the evidence that S.T. was suffering from bipolar disorder presenting as mania with psychotic features, which is a "mental and emotional behavioral health disorder." It found that S.T.

4

was "disorganized, paranoid, [had] superficial affect, labile mood, guarded, with impaired impulse control and judgment, erratic, [and] angry aggressive behavior." The court found that the State failed to prove by a preponderance of the evidence that S.T. "present[ed] a high probability of serious physical harm" resulting from an inability to provide for his essential health and safety, as required under RCW 71.05.020(25)(a). However, it found that pursuant to RCW 71.05.240, the State had proven by a preponderance of the evidence that due to his behavioral health disorder, S.T. presented a likelihood of serious harm to others and was gravely disabled as defined by RCW 71.05.020(25)(b).[4] As such, the trial court found that a less restrictive treatment alternative was inappropriate and not in S.T.'s best interests "because although improving, he is not yet mentally stable and does not yet have an outpatient treatment provider." It ordered that S.T. be involuntarily detained for treatment for a period not to exceed 14 days at Fairfax Hospital.

S.T. timely appeals.

ANALYSIS

S.T. challenges the trial court's findings that he posed a likelihood of serious harm and was gravely disabled because they are not supported by substantial evidence. Specifically, he contends that contrary evidence in the record demonstrates that he "stabilized rapidly" and appeared "calm, cooperative, and coherent." By contrast, the State argues that the record supports the trial court's findings that he presented a likelihood of serious harm to

---

[4] Further, the trial court dismissed Fairfax's claim that S.T. was gravely disabled as defined by RCW 71.05.020(25)(a).

others and, as defined by RCW 71.05.020(25)(b), was gravely disabled. We agree with the State.[5]

On appeal, we review whether substantial evidence supports a trial court's findings of fact and whether those findings support its conclusions of law. In re Det. of LaBelle, 107 Wn.2d 196, 209, 728 P.2d 138 (1986). Substantial evidence is "the quantum of evidence 'sufficient to persuade a fair-minded person of the truth of the declared premise.' " In re Det. of K.P., 32 Wn. App. 2d 214, 221, 555 P.3d 480 (2024) (quoting In re Det. of H.N., 188 Wn. App. 744, 762, 355 P.3d 294 (2015)). We review such challenges in the light most favorable to the State. In re Det. of B.M., 7 Wn. App. 2d 70, 85, 432 P.3d 459 (2019).

A person may be involuntarily committed for treatment of behavioral health disorders pursuant to the ITA. [6] LaBelle, 107 Wn.2d at 201-02. However, a behavioral health disorder alone is not enough to permit the significant deprivation of liberty encompassed by a commitment order for involuntary treatment. Id. at 201. A court can order commitment for involuntary treatment if the person poses a likelihood of serious harm or is gravely disabled. RCW 71.05.240(4)(a). S.T. challenges the trial court's findings that he posed a likelihood of serious harm and that he was gravely disabled as defined in RCW 71.05.020(25)(b).

---

[5] The State acknowledges that this appeal is not moot and can proceed on the merits.
[6] A "behavioral health disorder" is defined as "either a mental disorder as defined in this section, a substance use disorder as defined in this section, or a co-occurring mental disorder and substance use disorder." RCW 71.05.020(8). A "mental disorder" is defined as "any organic, mental, or emotional impairment which has substantial adverse effects on a person's cognitive or volitional functions." RCW 71.05.020(39).

A.     Likelihood of Serious Harm

First, the ITA defines "likelihood of serious harm" to mean that there is a substantial risk that the individual will cause physical harm to themselves, another person, or property or that they have threatened the safety of another. RCW 71.05.020(37). A substantial risk of harm need not be "imminent," but it must be evidence of "a recent overt act," which includes causing the harm or "creat[ing] a reasonable apprehension of dangerousness." In re Det. of Harris, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982).

In its written findings, the court found by a preponderance of the evidence that S.T. "presents a substantial risk of physical harm to others as evidenced by behavior that has caused harm or which places another person or persons in reasonable fear of sustaining such harm as a result of a behavioral health disorder." It attributed its finding of substantial likelihood of harm to S.T. grabbing his mother, pushing her into a wall, headbutting her, and "throwing her around like a rag doll."

Here, S.T. acknowledges his agitated behavior and his aggressiveness toward his mother by headbutting her. Nevertheless, he argues he rapidly stabilized after receiving a mood stabilizer at the hospital and was "calm, cooperative, and coherent." He points to the fact that he was medication compliant beginning on December 13. Additionally, to show his improvement, he notes that he participated in group sessions, completed his activities of daily living (ADLs) and had appropriate affect and behavior. Although his medical chart notes document his agitation and lack of sleep during the course of the hearing,

which took place over two days, he asserts this was attributable to the stress of the hearing. He also asserts that his prior hospitalizations do not support a finding that he needed involuntary treatment, but rather that he "stabilizes rapidly and does well once he is back on his medication."

Although S.T. may have stabilized while at Fairfax Hospital—December 12 through December 19—we agree with the State that nevertheless, there is also substantial evidence supporting the trial court's finding that he posed a likelihood of serious harm to others. At the time of the hearing, Fairfax Hospital's court evaluator Vallee observed that S.T. "was often crying. . . . talking throughout the testimony. . . . threw his glasses down at one point on the table, fairly impulsive." Vallee noted that S.T. "is improving, but at this point he doesn't have a psychiatrist to monitor his medications," and that he did not have "outpatient services at all to help with the transition back to the community." Vallee further testified that S.T. needed to be monitored so his providers could find the "therapeutic range" for his medications to increase his mood stability. Vallee opined that S.T.'s release plan—seeing his general physician—was "concerning to me as his medications are apparently challenging to stabilize him with," and he sought to engage with mental health alternatives, like yoga for treatment. Thus, although S.T. presented calmly when Vallee met with him on December 15, she concluded that "his insight was impaired in missing the follow-up and the repeated pattern of hospitalizations and not needing a psychiatrist."

Additionally, S.T.'s mother testified that she remained fearful of him. Alexander testified as to her fear of harm when S.T. headbutted her as well as

the harm—swollen forehead—she experienced therefrom. Alexander also testified that prior to being admitted to Evergreen Health, S.T. made a sexually explicitly comment to his then-girlfriend in front of Alexander that scared them.[7] These were recent, overt acts. Alexander also testified that she was fearful of S.T. when she talked to him the night before her testimony because he was angry with her for testifying, and she expressed that she did not want him returning home to stay with her unless he was stabilized on his medication. Vallee concluded that "at this point [S.T.'s] showing us that he is not stabilized to the point where the risk factor (likelihood of harm) will go away," and that "the potential for violence is still considered high," and recommended S.T. remain in inpatient treatment. We conclude that although S.T. highlights evidence favorable to him showing improvement, viewed in the light most favorable to the State, substantial evidence supports the trial court's decision that S.T. presented a substantial risk of physical harm to others.

### B. Gravely Disabled

The ITA defines "gravely disabled" in two distinct, alternative ways:

> [A]s a result of a behavioral health disorder (a) Is in danger of serious physical harm resulting from a failure to provide for [their] essential human needs of health or safety; or (b) manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control over [their] actions and is not receiving such care as is essential for [their] health or safety."[8]

---

[7] In its findings, the court noted that Alexander's fear arose from "observing his aggressive statements."

[8] RCW 71.05.020(25).

The second way, RCW 71.05.020(25)(b), requires the State to show that the person (1) " 'manifests severe deterioration in routine functioning evidenced by repeated and escalating loss of cognitive or volitional control' " and that (2) they are " 'not receiving such care as is essential for his or her health or safety.' " LaBelle, 107 Wn.2d at 205 (quoting former RCW 71.05.020(1)(b) (LAWS OF 1979, ch. 215, § 5)) (current RCW 71.05.020(25)(b)). Further, before a court can order an individual to be committed to a licensed treatment facility it must consider less restrictive alternatives. RCW 71.05.240(4)(a).

The trial court dismissed the State's claim that S.T. was gravely disabled under subsection (a). However, the trial court found by a preponderance of the evidence that S.T. was gravely disabled under subsection (b) because he demonstrated severe deterioration in his functioning and an absence of cognitive and volitional control. In particular, it found that S.T. had deteriorated and was "engaging in bizarre, erratic, and aggressive behavior. . . . [and] wasn't sleeping at night," which it found to be a departure from his "loving and smart" baseline, wherein he could "have coherent, future oriented conversations with his family."

S.T. contends that there was not substantial evidence to support the trial court's finding that he was gravely disabled. By contrast, the State points to evidence that S.T. had deteriorated from his baseline and had not stabilized, was not sleeping and continued to behave erratically.

Alexander testified that typically, S.T. was a "very smart . . . wonderful person" who treated people with "respect and loving kindness." She testified to the events that led to his hospitalization, beginning several days before S.T. was

admitted to Evergreen Health, when they went to yoga together and S.T. took off his shirt and confronted a patron of the yoga studio accusing the patron of "hitting on" Alexander. Further, while driving home from yoga, S.T. yelled at a family "to use the crosswalk." Alexander also testified that S.T. was not sleeping and would rearrange things in their house at night and had poor hygiene because he would only "clean[ ] his feet in the sink." And he "suddenly decided that he was Muslim." Alexander testified that she did not feel comfortable having S.T. return home unless he was stabilized.

Vallee, Fairfax Hospital's court evaluator, identified various impacts his diagnosis had on his behaviors. For example, chart notes stated that S.T.'s "[c]oncentration has been very poor, and he was needing redirection to pay attention," and that his psychomotor skills were "retarded with some waxy hand movements." Another chart note provides "Abstract Thinking: Poor. [S.T.] is not able to interpret common proverbs. Insight: Poor, as evidenced by not recognizing need of treatment. Judgment also poor as evidenced by not recognizing need for treatment and inability to draw appropriate conclusions."

A chart note that describes the evening following the first day of the commitment hearing recorded that "[S.T.] was constantly pacing, checking door. [He] was dressed bizarrely, wrapping sheets around him." S.T. further asserts that although his medical chart notes introduced on the second day of the hearing documented his agitation and lack of sleep after the first day of the hearing, these conditions were attributable to the stress of the hearing. Even if stress contributed to his conditions, Vallee testified that "[S.T.] has not been able

11

to identify what sort of discharge plan he would follow, what a plan would be for his needs of health and safety . . . including housing, food, shelter."

S.T. acknowledged his actions that led to his emergency commitment, including that he was not sleeping and presented with tangential speech and catatonia. However, he points to the fact that his sleeping had improved while receiving treatment and that his catatonic symptoms, which he argues were induced by the intramuscular Haldol administered by Evergreen Health, dissipated after he was administered Ativan. But in LaBelle, the Washington Supreme Court rejected the argument that the two RCW 71.05.020(25)(b) requirements were "unconstitutional if not strictly construed" because it would "exclude those persons whose condition ha[d] stabilized or improved, even if minimally . . . by the time of the commitment hearing." 107 Wn.2d at 205. The LaBelle court reasoned that it could not read RCW 71.05.020(25)(b) to require a court to release persons "whose condition, as a result of the initial commitment, has stabilized or improved minimally—i.e., is no longer 'escalating'—even though that person otherwise manifests severe deterioration in routine functioning and, if released, would not receive such care as is essential for [their] health or safety." Id. at 207. Under this reasoning, the fact that S.T. improved while receiving treatment does not undercut the evidence that he had severely deteriorated, his cognitive processes remained inconsistent, and he had no plan to receive the care necessary for his health and safety. We conclude that the trial court's finding that S.T. was gravely disabled as defined by RCW 71.05.020(25)(b) is supported by substantial evidence.

The trial court did not err in entering an order committing S.T. to involuntary treatment for up to 14 days. We affirm.

_Chung, J._

WE CONCUR:

_Díaz, J._

_____, ACJ